**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | |
|---|---|
| TYCO HEALTHCARE GROUP LP and UNITED STATES SURGICAL CORPORATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> APPLIED MEDICAL RESOURCES CORPORATION, <br><br> *Defendant*. | ) ) ) ) ) ) ) ) ) ) ) ) <br> Civil Action No. 9:09-CV-176 <br><br> The Honorable Keith F. Giblin <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFFS TYCO HEALTHCARE GROUP LP AND UNITED STATES**
**SURGICAL CORPORATION'S OMNIBUS MOTION *IN LIMINE***

## TABLE OF CONTENTS

I.     MOTION *IN LIMINE* NO. 1:  The Court Should Exclude All Evidence, Testimony, And Argument Regarding Religious Beliefs Or Affiliation ............................1

II.    MOTION *IN LIMINE* NO. 2:  The Court Should Exclude All Evidence, Testimony, And Argument Regarding Applied's Patent Clearance Process And Purported Reliance Upon Opinions Of Counsel ..................................................................3

III.   MOTION *IN LIMINE* NO. 3:  The Court Should Exclude All Evidence, Testimony, And Argument Regarding The Fact That Plaintiffs Have Not Filed Any Lawsuit Against Ethicon For Infringement Of the Patents-In-Suit ............................5

IV.    MOTION *IN LIMINE* NO. 4: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Regarding Applied's Inequitable Conduct Defense Or Counterclaims Before The Jury ........................................8

V.     MOTION *IN LIMINE* NO. 5: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Regarding Any Alleged Non-Infringing Alternative That Has Never Been Available On the Market ..........................11

VI.    MOTION *IN LIMINE* NO. 6: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Suggesting That Any Of The Following Is A Non-Infringing Alternative Available To Applied:  (1) Dual-Thickness Fingers; (2) Single-Thickness Fingers; (3) Ethicon's Xcel Trocar Products..................................................................................................................14

VII.   MOTION *IN LIMINE* NO. 7: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Assigning Relative Importance To The Individual Elements Of Any Of The Asserted Claims........................................17

VIII.  MOTION *IN LIMINE* NO. 8: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Relating To The Invalidity And/Or Reasonable Royalty Verdict In The First Phase Of This Action.........................19

IX.    MOTION *IN LIMINE* NO. 9: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Relating To The Existence And/Or Result Of *Applied I*, *Applied II*, Or *Applied III* ....................................22

X.     MOTION *IN LIMINE* NO. 10: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Concerning The IRISH Seal As Prior Art ..............................................................................................................25

XI.    MOTION *IN LIMINE* NO. 11: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Related to the Outsourcing or Exporting of Jobs or to the Foreign Status of Companies Affiliated with Plaintiffs.........26

XII.   MOTION *IN LIMINE* NO. 12: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Suggesting That Tyco Has Invited Applied To Sell Trocars To Existing Tyco Accounts ...........................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
 960 F.2d 1020 (Fed. Cir. 1992) ................................................................. 6

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*,
 52 F.3d 1062 (Fed. Cir. 1995) ................................................................. 8

*Bourns, Inc. v. United States*,
 537 F.2d 486 (Ct. Cl. 1975) ................................................................. 19

*Broadcom Corp. v. Qualcomm Inc.*,
 543 F.3d 683 (Fed. Cir. 2008) ................................................................. 5

*Compaq Computer Corp. v. Ergonome Inc.*,
 387 F.3d 403 (5th Cir. 2004) ................................................................. 9

*Cordis Corp. v. Boston Scientific Corp.*,
 Civil Action No. 03-027, 2005 WL 1322953 (D. Del. June 3, 2005) ............................... 12, 13

*Cummins-Allison Corp. v. Glory Ltd.*,
 No. 02-7008, 2007 U.S. Dist. LEXIS 100594 (N.D. Ill. Mar. 5, 2007) ................................. 27

*Cybor Corp. v. FAS Techs.*,
 138 F.3d 1448 (Fed Cir. 1998) (en banc) ................................................................. 6

*Dyson Tech. Ltd. v. Maytag Corp.*,
 No. 05-434, 2009 U.S. Dist. LEXIS 55267 (D. Del. May 25, 2009) ...................................... 27

*Fort James Corp. v. Solo Cup Co.*,
 412 F.3d 1340 (Fed Cir. 2005) ................................................................. 5

*Fujifilm Corp. v. Benun*,
 605 F.3d 1366 (Fed. Cir. 2010) ................................................................. 20

*Gardco Mfg., Inc. v. Herst Lighting Co.*,
 820 F.2d 1209 (Fed. Cir. 1987) ................................................................. 8, 10

*Gearhart v. Uniden Corp. of Am.*,
 781 F.2d 147 (8th Cir. 1986) ................................................................. 27

*Gov't of Virgin Islands v. Petersen*,
 553 F.2d 324 (3d Cir. 1977) ................................................................. 1

*Grain Processing Corp. v. American Maize-Products Co.*,
   185 F.3d 1341 (Fed. Cir. 1999) ........................................................ 12

*In re Echostar*,
   448 F.3d 1294 (Fed. Cir. 2006) ...................................................... 4, 5

*In re Seagate Tech., LLC*,
   497 F.3d 1360 (Fed. Cir. 2007) ......................................................... 5

*In re Vogel*,
   422 F.2d 438 (C.C.P.A. 1970) ......................................................... 24

*Interconnect Planning Corp. v. Feil*,
   774 F.2d 1132 (Fed. Cir. 1985) ....................................................... 19

*Jamesbury Corp. v. Litton Indus. Prods., Inc.*,
   839 F.2d 1544 (Fed. Cir. 1988) ......................................................... 6

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   No 06-348, 2011 WL 197869 (E.D. Tex. Jan. 20, 2011) ...................... 12

*Lee's Aquarium & Pet Prods., Inc. v. Python Pet Prods., Inc*.,
   951 F. Supp. 1469 (S.D. Cal. 1997), *aff'd*, 152 F.3d 945 (Fed. Cir. 1998)................ 6

*Liquid Dynamics Corp. v. Vaughan Co.*,
   No. 01-6934, 2004 WL 2260626 (N.D. Ill. Oct. 1, 2004) ...................... 9

*Micro Chem., Inc. v. Lextron, Inc.*,
   318 F.3d 1119 (Fed. Cir. 2003) ....................................................... 12

*New York Cent. R.R. Co. v. Johnson*,
   279 U.S. 310 (1929).................................................................... 26

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*,
   No. 04-32, 2009 U.S. Dist. LEXIS 58860 (E.D. Tex. July 10, 2009) ..................... 26

*OddzOn Prods. v. Just Toys, Inc.*,
   122 F.3d 1396 (Fed. Cir. 1997) ....................................................... 25

*Ormco Corp. v. Align Tech., Inc.*,
   463 F.3d 1299 (Fed. Cir. 2006) ....................................................... 25

*Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.*,
   73 F.3d 1085 (Fed. Cir. 1995) ......................................................... 18

*Raysor v. Port Authority of New York & New Jersey*,
   768 F.2d 34 (2d Cir. 1985) .............................................................. 1

*Ruiz v. A.B. Chance Co.*,
    357 F.3d 1270 (Fed. Cir. 2004) ............................................................................... 18

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
    883 F.2d 1573 (Fed. Cir. 1989) ............................................................................... 17

*Studiengesellschaft Kohle mbH v. Dart Indus., Inc.*,
    549 F. Supp. 716 (D. Del. 1982), *aff'd*, 726 F.2d 724, 728-29 (Fed. Cir. 1984) ...................... 6

*Trading Techs. Int'l v. eSpeed, Inc.*,
    507 F. Supp. 2d 870 (N.D. Ill. 2007) ..................................................................... 9

*United States v. Cooper*,
    286 F. Supp. 2d 1283 (D. Kan. 2003) ................................................................... 2

*United States v. Deel*,
    No. 09-22, 2010 WL 519836 (W.D. Va.  Feb. 11, 2010) ..................................... 2

*United States v. Livingston*,
    816 F.2d 184 (5th Cir. 1987) ................................................................................. 1

*United States v. Shabazz*,
    No. 97-183, 1998 WL 744060 (D. Or. Oct. 19, 1998) ............................................ 2

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................................... 17

**Statutes**

35 U.S.C. § 101 ..................................................................................................... 24

35 U.S.C. § 102 ..................................................................................................... 25

35 U.S.C. § 102(g) ............................................................................................ 25, 26

35 U.S.C. § 103 ............................................................................................ 17, 18, 25

**Rules**

Fed. R. Civ. P. 42(b) ............................................................................................. 8

Fed. R. Evid. 401 ........................................................................................... passim

Fed. R. Evid. 402 ........................................................................................... passim

Fed. R. Evid. 403 ........................................................................................... passim

Fed. R. Evid. 404 ................................................................................................. 22

FED. R. EVID. 610 .................................................................................................................. 1

Local Patent Rule 3-7 ........................................................................................................ 1, 3, 4

**Treatises**

28 Charles Alan Wright & Victor James Gold,
  Federal Practice & Procedure § 6153 (2008) ............................................................... 2

Pursuant to the Court's Amended Scheduling Order dated October 25, 2010, and Local Rule CV-7, Plaintiffs Tyco Healthcare Group LP ("Tyco") and United States Surgical Corporation ("USSC") (collectively, "Plaintiffs"), respectfully move *in limine* on the issues set forth below.

## I.       MOTION *IN LIMINE* NO. 1:  The Court Should Exclude All Evidence, Testimony, And Argument Regarding Religious Beliefs Or Affiliation

Pursuant to Federal Rules of Evidence 401, 402, 403, and 610, the Court should preclude Applied from offering any evidence, testimony, or argument pertaining to the religious beliefs or affiliation of any witness.  Based on testimony he gave during the first trial, Plaintiffs anticipate that Said Hilal, Applied's CEO, will testify on direct examination that he attended "Good Shepherd Protestant School."  (Trial Tr. at 951:12-14.)[1]  This gratuitous reference to a religious high school education is irrelevant and highly prejudicial and should be excluded from the second trial, along with any other references to witnesses' religious beliefs or affiliation.

Rule 610 provides that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purposes of showing that by reason of their nature the witness' credibility is impaired or enhanced."  FED. R. EVID. 610.  As the Third Circuit has explained, this rule "clearly prohibits" putting "before the jury the religious affiliation and beliefs" of a witness "when it is used to enhanced the witness' credibility - and no other purposes for its admission has been suggested."  *Gov't of Virgin Islands v. Petersen*, 553 F.2d 324, 328 (3d Cir. 1977); *see also Raysor v. Port Authority of New York & New Jersey*, 768 F.2d 34, 40 (2d Cir. 1985) (witness may not bolster herself by testifying about her religion or her faithful and long marriage), *cited in United States v. Livingston*, 816 F.2d 184, 191 (5th Cir. 1987).  Such evidence is excluded

---

[1]   For the Court's convenience, all trial testimony cited herein from the March 2010 trial in this action is attached as Exhibit 1 to the Declaration of Benoit Quarmby ("Quarmby Decl.").

"because it is presumed to threaten unfair prejudice.  This prejudice can be either supportive or corrosive of credibility."  28 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure § 6153 (2008).

Courts have excluded evidence of religious beliefs or affiliation as inadmissible, even where the testimony is a part of a witness's general background.  *See, e.g.*, *United States v. Deel*, No. 09-22, 2010 WL 519836, *1 & n.2 (W.D. Va.  Feb. 11, 2010) ("While military service or disability is not admissible as character evidence in this case, I will allow a defendant who testifies to give a brief and straight-forward recitation of his life history, including employment and family details, simply as background evidence for the jury's benefit to judge his credibility. . . .  Of course, evidence of the religious beliefs or opinions of a witness is not admissible to enhance credibility."); *United States v. Cooper*, 286 F. Supp. 2d 1283, 1287 (D. Kan. 2003) (granting "motion to exclude evidence of the defendants' religious beliefs or opinions in order to enhance or impair the defendants' credibility"); *United States v. Shabazz*, No. 97-183, 1998 WL 744060, *1 (D. Or. Oct. 19, 1998) (granting motion to preclude defendant from raising evidence or argument "that the defendants' religious beliefs enhance their credibility" without first informing the court).

The fact that Mr. Hilal went to a religious high school has absolutely no relevance or probative value here, and referring to that school runs the great risk of improperly bolstering his credibility before the jury.  Such testimony is thus barred by Federal Rule of Evidence 610 or, alternatively, is so highly prejudicial and of such little probative value that it should be excluded under either Federal Rule of Evidence 402 or 403.[2]

---

[2]   Applied may assert that Plaintiffs did not object to this testimony during the March 2010 trial.  Mr. Hilal's testimony, however, was unanticipated by Plaintiffs, and any objection to

2

## II.     MOTION *IN LIMINE* NO. 2:  The Court Should Exclude All Evidence, Testimony, And Argument Regarding Applied's Patent Clearance Process And Purported Reliance Upon Opinions Of Counsel

Pursuant to Federal Rules of Evidence 401, 402, and 403 and Local Patent Rule 3-7, the Court should preclude Applied from offering any evidence, testimony, or argument regarding its patent clearance process or suggesting that they obtained or relied on advice of patent counsel (whether written or oral) to defend against Plaintiffs' allegations of willful patent infringement. Such presentation is irrelevant given Applied's refusal to waive the attorney-client privilege with respect to any such advice and would confuse and mislead the jury, needlessly complicate the trial, and prejudice Plaintiffs.

The Court's October 25, 2010 Amended Scheduling Order required Applied to comply with Local Patent Rule 3-7 by January 7, 2011, and produce or make available for inspection any written opinions upon which Applied intended to rely as a defense to willfulness.[3]  Applied has

---

this testimony would only have highlighted it for the jury, causing further undue prejudice to Plaintiffs.

[3]   The rule states that

> each party opposing a claim of patent infringement that will rely on an opinion of counsel as part of a defense [to a claim of willful infringement] shall:
>
> (a) Produce or make available for inspection and copying the opinion(s) and any other documents relating to the opinion(s) as to which that party agrees the attorney-client or work product protection has been waived; and
>
> (b) Serve a privilege log identifying any other documents, except those authored by counsel acting solely as trial counsel, relating to the subject matter of the opinion(s) which the party is withholding on the grounds of attorney-client privilege or work product protection.
>
> A party opposing a claim of patent infringement who does not comply with the requirements of this P. R. [3.7] shall not be permitted to rely on an opinion of counsel as part of a defense [to willful infringement] absent a stipulation of all parties or by order of the Court, which shall be entered only upon a showing of good cause.

Local Patent R. 3-7.  The bracketed language is being deleted pursuant to General Order 11-03 (Mar. 15, 2011).

not provided Plaintiffs with any such opinion(s), but instead has asserted the attorney-client privilege with respect to those opinions.  Specifically, in its Supplemental Response to Plaintiffs' Interrogatory No. 14, which requested a detailed description of "all facts and legal bases on which Applied relies in support of any contention that any infringement of any claim of U.S. Patent No. 5,603,702 or U.S. Patent No. 5,895,377 is or has not been willful, including any opinions of counsel or documents on which Applied relies," Applied stated that it:

> has been discussing these products with its attorneys on an ongoing basis from the design stage to the present day.  ***However, the content of Applied conversation's with its attorneys is confidential and protected by the attorney-client privilege*** and therefore cannot be disclosed to [Plaintiffs' expert] or anyone else working for Plaintiffs.

(Applied's Supp. Resp. to Plaintiffs' Third Set Of Interrogatories (Nos. 14-15), at 7 (dated Feb. 14, 2011) (emphasis added), attached as Exhibit 2 to the Quarmby Decl.)  Likewise, Applied has declined to waive privilege regarding any discussions it had during its internal clearance process for either its Ws, or pleated skirt, septum shield or its single-thickness fingers, or petal, septum shield.  (Johnson Dep. at 195:11-197:18 (Dec. 22, 2010), attached as Exhibit 3 to the Quarmby Decl.)

It is well established that "when an alleged infringer asserts its advice-of-counsel defense regarding willful infringement of a particular patent, it waives its immunity for any document or opinion that embodies or discusses a communication to or from it concerning whether that patent is valid, enforceable, and infringed by the accused [product]."  *In re Echostar*, 448 F.3d 1294, 1304 (Fed. Cir. 2006).  As discussed, however, Applied has steadfastly invoked the attorney-client privilege with respect to any legal advice that it received here.  Applied therefore should be precluded, pursuant to Federal Rules of Evidence 402 and 403 and Local Patent Rule 3-7, from telling the jury that it obtained or relied on any advice of counsel, including through its

internal clearance process, to defend against Plaintiffs' allegations of willful patent infringement. *See, e.g.*, *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 700 (Fed. Cir. 2008) ("Although Qualcomm stresses that it did obtain opinions of counsel regarding invalidity of the patents in suit, it concedes that the district court properly excluded this fact from evidence in light of Qualcomm's decision not to waive privilege with respect to these opinions.") (emphasis omitted).

Were Applied permitted to make such a presentation, it would be able to use the attorney-client privilege as both a sword—by showing that it sought legal advice—and a shield—by refusing to disclose the content of the legal advice. That is precisely the situation that the Federal Circuit has sought to avoid. *See, e.g.*, *In re Seagate Tech.*, *LLC*, 497 F.3d 1360, 1372 (Fed. Cir. 2007) (prohibition on selective disclosure "is grounded in principles of fairness and serves to prevent a party from simultaneously using the privilege as both a sword and a shield; that is, it prevents the inequitable result of a party disclosing favorable communications while asserting the privilege as to less favorable ones") (citing *EchoStar*, 448 F.3d at 1301; *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed Cir. 2005)).

## III.   MOTION *IN LIMINE* NO. 3:  The Court Should Exclude All Evidence, Testimony, And Argument Regarding The Fact That Plaintiffs Have Not Filed Any Lawsuit Against Ethicon For Infringement Of the Patents-In-Suit

Plaintiffs anticipate that Applied will seek to raise the absence of any infringement action against Ethicon over the patents-in-suit, claiming such fact is "evidence" that Plaintiffs do not "value" the patents, or that such evidence somehow relates to "non-infringing alternatives available" to Applied. Such presentation, however, is wholly irrelevant to whether *Applied's products* infringe Plaintiffs' patents, or to the amount of damages owed to Plaintiffs as a result of Applied's infringement, and would therefore confuse and mislead the jury, unnecessarily complicate the trial, and prejudice Plaintiffs. Pursuant to Federal Rules of Evidence 401, 402, and 403, the Court should preclude Applied from offering any evidence, testimony, or argument

regarding the fact that Plaintiffs have not filed any lawsuit against third-party Ethicon for infringement of the patents-in-suit.

To determine infringement, "the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed Cir. 1998) (en banc). Infringement is determined by comparing the Applied trocar products to the asserted claims.  It is irrelevant whether a trocar made by Ethicon – which is not a party to this action or in any way affiliated with Applied – might also infringe the patents-in-suit and whether Plaintiffs have pursued or planned to pursue patent infringement claims against Ethicon.

Nor could this evidence support an argument that Plaintiffs somehow do not "value" their patents, or that they have sat on their rights with respect to the patents-in-suit.  Indeed, Applied has not asserted laches or equitable estoppel defenses.  *Cf. Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1553 (Fed. Cir. 1988) ("[T]he high cost of patent litigation and the comparatively small amounts recoverable from each infringer justify not requiring the patent owner to sue all infringers at the same time. . . ."), *overruled in part on other grounds by A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1038-39 (Fed. Cir. 1992); *Lee's Aquarium & Pet Prods., Inc. v. Python Pet Prods., Inc*., 951 F. Supp. 1469, 1482-83 (S.D. Cal. 1997) ("Controlling Federal Circuit authority makes it clear that there must be inaction with respect to the infringer-in-suit … in order to create a claim of equitable estoppel. . . . Python's actions towards or inaction with respect to [the third party] do not give rise to a claim on LAPP's behalf."), *aff'd*, 152 F.3d 945 (Fed. Cir. 1998); *Studiengesellschaft Kohle mbH v. Dart Indus., Inc.*, 549 F. Supp. 716, 757 (D. Del. 1982) ("[p]atentees are not required to pursue simultaneously every party suspected of infringing" to avoid laches), *aff'd* 726 F.2d 724, 728-29 (Fed. Cir. 1984).  The decision when and whom to sue rests with the patentee, and Applied is not

entitled to create mischief with or threaten the attorney-client privilege with respect to such decisions.

The presence or absence of any lawsuit against Ethicon is also irrelevant to Applied's claim that Ethicon's Xcel trocar is an acceptable and available noninfringing alternative.  In the first place, the absence of any lawsuit to date against Ethicon does not warrant the conclusion that the Ethicon trocars are "noninfringing."[4]  But, even assuming somehow that the Ethicon trocars are "noninfringing," such technology is clearly *not available to Applied* because, as Applied's Rule 30(b)(6) witness admitted, the Xcel trocar is covered by at least one Ethicon patent.  (*See* Albrecht Dep. Tr. at 109:5-110:5, 111:2-8 (Feb. 8, 2011), attached as Exhibit 5 to the Quarmby Decl.; U.S. Patent No. 7,785,294 at Fig. 6 & col. 2:41-42, 3:10-14, 7:33-41 (describing Figure 6 as depicting preferred embodiment), attached as Exhibit 6 to the Quarmby Decl.; *see also* Motion *In Limine* No. 6, *infra*.)

Applied therefore should be prohibited under Federal Rules of Evidence 401 through 403 from presenting any evidence, testimony, or argument regarding the absence of any patent infringement lawsuit to date concerning Ethicon's trocars.

---

[4]   Among other things, to reach that conclusion would entail a time-consuming mini-trial over Ethicon's trocars, which would confuse or mislead the jury by distracting it from the task of comparing the claims of the patents-in-suit to the accused Applied trocars.  This is especially true considering that Applied has no basis for claiming that the Ethicon trocars qualify as "non-infringing."  No Applied expert has actually compared the claims of the asserted patents to the Ethicon trocars to show that they are, in fact, non-infringing.  Indeed, in opining that the Ethicon trocars allegedly constitute non-infringing alternatives, Applied's damages expert, James Nawrocki, merely notes that Ethicon's trocar products "have never been accused of infringing the patents at issue."  (Expert Report of James J. Nawrocki ("Nawrocki Report") at ¶ 51 (Jan. 21, 2011), attached as Exhibit 4 to the Quarmby Decl.)  Any attempt by Applied to now offer any untimely expert opinion comparing the Ethicon trocars to the asserted claims should not be allowed.

## IV.	MOTION *IN LIMINE* NO. 4: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Regarding Applied's Inequitable Conduct Defense Or Counterclaims Before The Jury

Pursuant to Federal Rule Of Evidence 403, Plaintiffs respectfully move this Court *in limine* to preclude Applied from soliciting or offering any testimony, evidence or argument regarding Applied's inequitable conduct defense or counterclaims before the jury.  Consistent with this request, and pursuant to Rule 42(b), Plaintiffs respectfully move this Court to exercise its discretion and try Applied's inequitable conduct defense to the bench.

Inequitable conduct is an equitable defense for which there is no Seventh Amendment right to a jury trial.  *See Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1213 (Fed. Cir. 1987) (affirming bifurcation of an inequitable conduct defense from a jury trial and ruling that "[s]uch a separation is precisely the type contemplated by Rule 42(b) and does not run afoul of the Seventh Amendment").  The resolution of equitable defenses is "committed to the sound discretion of the trial judge."  *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed. Cir. 1995).  Accordingly, this Court has the discretion to preclude Applied from presenting its inequitable conduct defense and counterclaims to the jury and reserve Applied's inequitable conduct defense and counterclaims for a bench trial.  *See*, *e.g.*, FED. R. CIV. P. 42(b) (authorizing courts to bifurcate a trial in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy); *Gardco Mfg.*, 820 F.2d at 1213.

Plaintiffs made a similar motion *in limine* in advance of the March 2010 trial in this action.  (Civil Action No. 9:06-cv-151, D.I. 199 at 1-3, attached as Exhibit 7 to the Quarmby Decl.; *see also* D.I. 40 (renewing Omnibus Motion *In Limine* from Civil Action No. 9:06-cv-151).)  The Court granted Plaintiffs' motion, noting that the presentation of Applied's inequitable

conduct defense to the jury would cause "the dangers of confusion of the issues and waste of

time."  (D.I. 63 at 3.)  The Court further noted:

> [T]he only person who would be able to state for certainty whether
> the Yoon reference was considered by the Examiner is the
> Examiner himself.  This individual, Paul Hirsch, is not on either
> party's witness list.  The court sees little advantage to allowing
> extended presentation of only somewhat relevant evidence, which
> will ultimately be inconclusive regarding whether or not the Yoon
> patent was before the Examiner during prosecution, at trial.

(*Id.*)

The same concerns raised by the Court in the first phase still exist in the present phase of

the litigation.  Precluding Applied from soliciting or offering any testimony, evidence or

argument regarding Applied's inequitable conduct defense or counterclaims to the jury and trying

inequitable conduct to the bench is appropriate because the evidence that Applied seeks to

present to the jury relating to its inequitable conduct defense is highly likely to prejudice

Plaintiffs and further complicate an already complex jury trial.  *See* FED. R. EVID. 403; *Compaq

Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 409 (5th Cir. 2004) (excluding evidence that

would have been prejudicial and inflammatory).  In its Answer to Plaintiffs' Amended

Complaint, Applied alleges as its First Affirmative Defense that the '854 patent is unenforceable

in light of alleged failures to disclose allegedly material prior art to the PTO during the

prosecution of the '854 patent intentionally and with deceptive intent.  (D.I. 197 at 6-10.)

"Because evidence of inequitable conduct is effectively evidence of fraud, there is a danger the

evidence will unnecessarily 'spill over' to [plaintiff's] prejudice on issues that are before the

jury."  *Liquid Dynamics Corp. v. Vaughan Co.*, No. 01-6934, 2004 WL 2260626, at *7 (N.D. Ill.

Oct. 1, 2004) (emphasis omitted); *see also Trading Techs. Int'l v. eSpeed, Inc*., 507 F. Supp. 2d

870, 873-74 (N.D. Ill. 2007) ("[E]vidence of inequitable conduct, essentially fraud, may very

9

well prejudice the patentee in its case to the jury. It is the patent, not the patentee, on trial before the jury. . . . [T]o the extent that testimony, evidence and argument is relevant only to fraud it should be heard outside the jury's presence.").

Moreover, evidence related to Applied's inequitable conduct defense and counterclaims is not relevant to the legal issues in this case that the jury will have to decide – namely, infringement, validity and damages. *See Gardco Mfg.*, 820 F.2d at 1213 (affirming bifurcation of the defendant's inequitable conduct defense and explaining that "the *conduct-of-the-applicant-in-the-PTO* issue raised in the nonjury trial and the separated infringement/validity issues are distinct and without commonality either as claims or in relation to the underlying fact issues") (emphasis in original). There is thus no reason to present evidence concerning Applied's inequitable conduct defense and counterclaims to the jury.

Accordingly, Plaintiffs respectfully request that the Court preclude Applied from soliciting or offering any testimony, evidence or argument regarding Applied's inequitable conduct defense or counterclaims before the jury.  Consistent with its motion, Plaintiffs respectfully request that the Court proceed with an inequitable conduct bench trial, if necessary, after the conclusion of the jury trial.  Presentation of evidence on this issue should not be longer than six hours total.  Applied's evidence in support of this defense is presented through two witnesses – Andrew J. Dillon and Gale R. Peterson.[5]  Plaintiffs intend to call at most two rebuttal witnesses – Jack C. Goldstein and Basam Nabulsi.

---

[5]   Mr. Peterson's testimony is subject to Plaintiffs' pending motion to strike.  (D.I. 230.)

## V.   MOTION *IN LIMINE* NO. 5: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Regarding Any Alleged Non-Infringing Alternative That Has Never Been Available On the Market

Pursuant to Federal Rules Of Evidence 401, 402, and 403, Plaintiffs respectfully move this Court *in limine* to preclude Applied from soliciting or offering any testimony, evidence or argument regarding any alleged non-infringing alternative that has never been available on the market.

Based on statements made in Applied's expert reports and in Applied's submissions to this Court, Plaintiffs expect Applied to argue at trial that unidentified and uncommercialized designs constitute non-infringing alternatives that allegedly reduce Plaintiffs' requested damages with respect to both lost profits and a reasonable royalty.[6]  For example, Applied has stated:

> [I]f Applied had not been able to sell the products accused of infring[ement] . . . , it would have turned to one of several available alternatives, including the use of prior art technology, that would not have been covered by the asserted claims . . . . As a result of Applied's history of innovation, heavy investment in research and development, highly integrated manufacturing operations, and significant experience and expertise in trocar design, these changes could have been implemented with relatively little, if any, investment in time or expense.

(Expert Report of James J. Nawrocki ("Nawrocki Report") at ¶ 47 (Jan. 21, 2011), attached as Exhibit 4 to the Quarmby Decl.; *see also id.* at ¶¶ 50, 102, 104; D.I. 231 at 3-4.)  Applied should not be permitted to rely on various unspecified, unmarketed designs to defeat Plaintiffs' damages claim.

---

[6]   Plaintiffs anticipate testimony similar to testimony in the first phase made, for instance, by Jeremy Albrecht claiming that he developed "40 to 50 [septum shield] prototypes" in addition to the design ultimately found to infringe claim 6 of the Smith '377 patent and that several of these prototypes were allegedly acceptable alternatives to the infringing design.  (Trial Tr. at 1312:11-1313:12, 1316:25-1317:11, attached as Exhibit 1 to the Quarmby Decl.)  Plaintiffs also anticipate that Applied will try to argue that it could theoretically develop septum shields that practice claim 12 and 13 of the Green '143 patent without infringing the remaining claims of the Green and Smith patents.  (*See, e.g.*, Nawrocki Report at ¶¶ 24, 102; D.I. 231 at 4.)

"[T]o be an acceptable non-infringing substitute, [a] product or process must have been available or on the market at the time of infringement." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999) (emphasis omitted) (considering alleged non-infringing alternatives as part of lost profits analysis); *see also LaserDynamics, Inc. v. Quanta Computer, Inc.*, No 06-348, 2011 WL 197869, at *3 (E.D. Tex. Jan. 20, 2011) (considering alleged non-infringing alternatives as part of reasonable royalty analysis). Alleged alternatives not on the market during the relevant damages period are presumed to be unavailable. *Grain Processing*, 185 F.3d at 1353. In order to overcome this presumption, the accused infringer has the burden to show that the alleged alternative was actually available and cannot rely on "[m]ere speculation or conclusory assertions." *Id.* Indeed, the Federal Circuit has advised trial courts to "proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement." *Id.* While "[a]cceptable substitutes that the infringer proves were available" can limit the recoverable amount of damages, "substitutes only theoretically possible will not." *Id.* Courts applying *Grain Processing* have rejected alleged non-infringing alternatives that are not on the market as unavailable. *See, e.g.*, *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1123-24 (Fed. Cir. 2003); *LaserDynamics*, 2011 WL 197869, at *3; *Cordis Corp. v. Boston Scientific Corp.*, Civil Action No. 03-027, 2005 WL 1322953, at *2-3 (D. Del. June 3, 2005).

The alternative designs claimed by Applied constitute complete and utter speculation. Applied has not even bothered to identify its possible alternative designs, and therefore such designs are purely hypothetical. Moreover, other than pointing in a conclusory fashion to its purported "history of innovation, heavy investment in research and development, highly integrated manufacturing operations, and significant experience and expertise in trocar design,"

(*see* Nawrocki Report at ¶ 47), Applied has offered no concrete evidence of its ability to get any of its hypothetical non-infringing designs to market. *See Cordis*, 2005 WL 1322953, at *2 ("The ability to make a noninfringing alternative alone is not enough to render such a substitute 'available' . . . ."). As Applied employees have acknowledged, the trocar design process is a lengthy one. (*See, e.g.*, Albrecht Dep. at 32:12-33:4, 34:12-24 (Feb. 8, 2011), attached as Exhibit 5 to the Quarmby Decl.) The length of the design process further highlights the speculative nature of Applied's claims to alternative designs not on the market. Moreover, Applied cannot simply sell any design it develops on the market. Rather, because trocar products are devices regulated by the FDA, any alternative would have to first satisfy any FDA requirements before being made available on the market, and Applied has no evidence that it could meet such requirements.

But even assuming that Applied could make its hypothetical designs available on the market, Applied has no proof that such designs would be acceptable to consumers. Especially in the area of trocar engineering where several competing design interests must be carefully balanced, (*see, e.g.*, Johnson Dep. at 144:9-145:1 (Dec. 22, 2010), attached as Exhibit 3 to the Quarmby Decl.), it should never be assumed that changes to the septum shield, no matter how small, are acceptable.

Lacking actual evidence of defined alternatives that are non-infringing, available, and acceptable, Applied's reliance on unmarketed designs is merely a theoretical exercise that should not be permitted. Any reference to these irrelevant designs as non-infringing alternatives would prejudice Plaintiffs by potentially causing confusion and misleading the jury. For all these reasons, the Court should preclude Applied from soliciting or offering any testimony, evidence

or argument regarding any alleged non-infringing alternative that has never been available on the market.

## VI.   MOTION *IN LIMINE* NO. 6: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Suggesting That Any Of The Following Is A Non-Infringing Alternative Available To Applied:  (1) Dual-Thickness Fingers; (2) Single-Thickness Fingers; (3) Ethicon's Xcel Trocar Products

Pursuant to Federal Rules Of Evidence 401, 402, and 403, Plaintiffs respectfully move this Court *in limine* to preclude Applied from soliciting or offering any testimony, evidence or argument suggesting that any of the following is a non-infringing alternative available to Applied: (1) the dual-thickness fingers septum shields that were found to infringe claim 6 of the Smith '377 patent in the March 2010 trial; (2) the single-thickness (or constant-thickness) fingers septum shields that are currently accused of infringing asserted claims of the Green '143 and Green '854 patents; and (3) Ethicon's Xcel trocar products that are claimed by at least U.S. Patent No. 7,785,294 ("the '294 patent").

Based on statements made in Applied's expert reports and in Applied's submissions to this Court, Plaintiffs expect Applied to argue at trial that the dual-thickness fingers septum shield, the single-thickness fingers septum shield, and the Ethicon Xcel trocar product are all non-infringing alternatives that allegedly reduce Plaintiffs' requested damages with respect to both lost profits and a reasonable royalty.  (*See, e.g.*, Expert Report of James J. Nawrocki ("Nawrocki Report") at ¶¶ 49, 51, 101, 103 (Jan. 21, 2011), attached as Exhibit 4 to the Quarmby Decl.; D.I. 231 at 4.)  Applied, however, fails to acknowledge that all these alleged alternatives are covered by one or more of its competitors' patents and cannot therefore qualify as non-infringing alternatives available to Applied.

Applied cannot claim that its septum shields having dual-thickness fingers are non-infringing.  These dual-thickness fingers septum shield (pictured below) were found by the jury to infringe claim 6 of the Smith '377 patent in the March 2010 trial:



(D.I. 105.)  Because Applied was previously found to infringe, Applied cannot rely on the dual-thickness fingers septum shield as a non-infringing alternative to the newly accused trocar products.  Applied similarly cannot rely on its septum shields having single-thickness fingers (pictured below) as non-infringing alternatives.



Although these single-thickness fingers are not accused of infringing the Smith patents, they are accused of infringing the Green patents in this phase of the litigation.  Because they are accused of infringement in this litigation, they cannot at the same time be considered non-infringing alternatives in this litigation.

Ethicon's Xcel product is also not a non-infringing alternative available to Applied. Applied has concluded that it "would have been able to use the design of Ethicon's seal

protectors" based on Applied's misinformed belief that "the only proprietary technology relating to the [Xcel] seal protectors is Applied's technology protected by its own patents (to which Ethicon is licensed)."  (Nawrocki Report at ¶¶ 51, 103.)  Applied employee and Rule 30(b)(6) witness Jeremy Albrecht admitted that Ethicon's trocar products are unavailable to Applied because Ethicon owns patents on its trocar products, confirming that Ethicon's technology is not available to Applied:

> Q.  And you are aware that Ethicon has applied for and gotten a number of patents? I'm not asking for a specific number.  But you are aware Ethicon has patents on trocars?
> A.  I -- I think it's safe to assume that Ethicon has patents on their products.

(Albrecht Dep. at 111:2-8 (Feb. 8, 2011), attached as Exhibit 5 to the Quarmby Decl.)  In fact, Mr. Albrecht further admitted that Ethicon's Xcel trocars and Xcel Optiview trocars are covered by at least the '294 patent assigned to Ethicon:

> Q.  BY MR. ARMENIO: Okay. Let's take a look at Figure 6 [of the '294 patent].  Did you ever break apart any Ethicon [X]cel trocar to a level of detail where you could see the component parts inside?
> A.  Yes.
> Q.  What does it look like inside a current Ethicon [X]cel trocar?
> A.  In order to -- referring to [X]cel proper or the [X]cel Optiview?
> Q.  Either one you want.
> A.  Regarding the [X]cel trocar, it looks pretty similar to Figure 6 on the inside.
> Q.  And then [X]cel -- you mentioned an [X]cel Optiview.  Is that different on the inside than the general [X]cel trocar?
> A.  The [X]cel Optiview does have some additional features that are not here for scope cleaning, also regarding the shape of the duck bills and some absorbent materials for regaining capillary action.
> Q.  So for Ethicon [X]cel Optiview, it looked like the pieces we see in Figure 6.  Plus there would be other pieces, other features in addition to those; is that right?
> A.  Yes.

(*Id.* at 109:5-110:5; *see also* '294 patent at Fig. 6 & col. 2:41-42, 3:10-14, 7:33-41 (describing

Figure 6 as depicting preferred embodiment), attached as Exhibit 6 to the Quarmby Decl.)  *See*

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (stating that a claim

construction that reads out the preferred embodiment "is rarely, if ever, correct").  Contrary to

Applied's beliefs, the Xcel trocar is therefore not available to Applied.  *See State Indus., Inc. v.*

*Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1581 (Fed. Cir. 1989) (stating that accused infringer could

not "rely on the availability of third party patents" as an alternative to mitigate damages).[7]

    For these reasons, any suggestion by Applied at trial that any of these designs constitute

non-infringing alternatives would only serve to confuse the jury and would prejudice Plaintiffs.

The Court should therefore preclude Applied from soliciting or offering any testimony, evidence

or argument suggesting that the dual-thickness fingers septum shield, the single-thickness fingers

septum shield, or Ethicon's Xcel trocar products are non-infringing alternatives available to

Applied.

**VII.    MOTION *IN LIMINE* NO. 7: Applied Should Be Precluded From Soliciting Or
         Offering Any Testimony, Evidence Or Argument Assigning Relative Importance To
         The Individual Elements Of Any Of The Asserted Claims**

    Pursuant to Federal Rules of Evidence 401, 402, and 403, the Court should exclude any

reference to the alleged relative importance of the individual elements of any of the claims of the

patents-in-suit as a basis for evaluating obviousness under 35 U.S.C. § 103.

---

[7]  Applied additionally has no basis for claiming that the Ethicon trocars qualify as "non-
infringing."  No Applied expert has actually compared the claims of the asserted patents to the
Ethicon trocars to show that they are, in fact, non-infringing.  Indeed, in opining that the Ethicon
trocars allegedly constitute non-infringing alternatives, Applied's damages expert, James
Nawrocki, merely notes that Ethicon's trocar products "have never been accused of infringing the
patents at issue."  (Nawrocki Report at ¶ 51.)  Any attempt by Applied to now offer any untimely
expert opinion comparing the Ethicon trocars to the asserted claims should not be allowed.  Nor
should Applied be allowed to assert that the absence of any patent infringement suit between
Plaintiffs and Ethicon on the patents-in-suit is proof that Ethicon's Xcel product is noninfringing.
(*See* Motion *In Limine* No. 3, *supra*.)

It is black-letter law that it is the claim as a whole that must be evaluated under § 103, not its individual or separate elements, and not by assigning value to any of its separate elements. Thus, "when determining obviousness, the claimed invention should be considered as a whole; there is no legally recognizable 'heart' of the invention."  *Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.*, 73 F.3d 1085, 1087 (Fed. Cir. 1995); *see also Ruiz v. A.B. Chance Co*., 357 F.3d 1270, 1275 (Fed. Cir. 2004).  It is therefore improper for a defendant to attempt to boil down the asserted claims to an individual element, or present evidence, argument, or testimony that obviousness should be judged on that basis.  *Ruiz*, 357 F.3d at 1275 ("Section 103 precludes . . . hindsight discounting of the value of new combinations by requiring assessment of the invention as a whole.").

Yet that is exactly what Applied has repeatedly sought to do in the Second Phase. Applied argues that the "annular ring" limitation of claims 14 or 31 of the '143 patent, or the "seating portions" limitations of claim 4 of the '854 patent, do not lie at the heart of the invention disclosed by the patent.  (D.I. 166 at 13-14, 19-20.)  Applied intends to argue that these additional limitations offer little to distinguish the newly asserted claims from those asserted in the First Phase, and that a finding of obviousness is therefore mandated in the Second Phase.  (*Id.*) But Applied's approach is fundamentally wrong.  "[S]ection 103 specifically requires consideration of the claimed invention 'as a whole'" and "prevents evaluation of the invention part by part."  *Ruiz*, 357 F.3d at 1275 (quoting 35 U.S.C. § 103).

Any argument that one individual element is more or less important is irrelevant and would confuse and mislead the jury, would prejudice Plaintiffs, and should therefore be excluded under Federal Rules of Evidence 401, 402, and 403.

18

**VIII.   MOTION *IN LIMINE* NO. 8: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Relating To The Invalidity And/Or Reasonable Royalty Verdict In The First Phase Of This Action**

Plaintiffs respectfully request that the Court exclude all evidence relating to either the jury's verdict of invalidity of claims 12 and 13 of the Green '143 patent, or its reasonable royalty damages award in the First Phase of this action.  Pursuant to Federal Rules 401, 402, and 403, such evidence would be of no probative value, and would be highly prejudicial to Plaintiffs.

First, evidence of the First Phase jury's verdict of invalidity of claims 12 and 13 of the Green '143 patent is irrelevant to the validity of the asserted claims of the patents-in-suit.   The jury's responsibility in the Second Phase of this matter is to determine whether the combination of *all the limitations* of the asserted claims is obvious in light of the prior art – not just the new limitations that were not at issue in the First Phase.  Indeed, a "domino approach," in which a dependent claim is merely compared with an invalidated claim from which it depends, and not the prior art, is wholly inappropriate since it "improperly gives prior-art effect to the subject matter of an invalid claim."  *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1137 (Fed. Cir. 1985) (quoting *Bourns*, *Inc. v. United States*, 537 F.2d 486, 493 (Ct. Cl. 1975)).

Yet Applied plans to adopt the domino approach rejected by the Federal Circuit. Plaintiffs anticipate that Applied will repeatedly reference the jury verdict of invalidity in the First Phase, and will argue that the asserted claims differ from the First Phase claims in only a few limitations – limitations that Applied has argued do not, when viewed in isolation, warrant a finding of non-obviousness.  Indeed, Applied already adopted this flawed approach in its pending motion for summary judgment of invalidity on the basis of collateral estoppel.  (D.I. 166.)  The domino approach, however, is legally flawed, lacks any probative value at all, and would only prejudice Plaintiffs.

Second, the Court should reject Applied's attempt to introduce evidence of the First Phase

19

reasonable royalty award.  (D.I. 105 at 3.)  That award is not probative of the reasonable royalty

applicable in the Second Phase, and is certain to prejudice Plaintiffs.  As a threshold matter,  the

First Phase jury awarded Plaintiffs a $1 per trocar royalty based on infringement of a *different*

claim of the Smith patents by *different* accused products.  The prior jury award related to Claim 6

of the Smith '377 patent.  Here, the asserted claims include claims 14 and 31 of the Green '143

patent, claim 4 of the '854 patent, claims 1 and 5 of the Smith '702 patent, and Claims 1 and 2 of

the Smith '377 patent.  The royalty that Plaintiffs seek is therefore necessarily different from the

$1 per trocar reasonable royalty that the jury awarded for claim 6 of the Smith '377 patent alone.

(Amended Expert Report of Raymond Sims ("Am. Sims Rep.") at 38-39 (Mar. 15, 2011),

attached as Exhibit 8 to the Quarmby Decl.)

Moreover, a reasonable royalty of $1 per trocar is far below any party's net profit margin

per trocar and does not reflect the royalty that a willing licensee and a willing licensor would

have agreed to in *2008* or *2009*.   In the First Phase of this case, the date of the hypothetical

negotiation was *February 2004*.[8]  (*Id.* at 39.)  But the hypothetical negotiation in the Second

Phase of this matter will have occurred in either June 2008, if the Green patents are deemed

infringed, or June 2009, if only the Smith patents are infringed.  (*Id.*)  Since competition between

Plaintiffs and Applied has increased significantly over time – as demonstrated by the fact that

---

[8]   Applied may argue that a March 2010 jury verdict on a hypothetical negotiation in
February 2004 is just as relevant as the agreements from the early-1990s to the mid-2000s relied
on by the parties' experts in establishing their reasonable royalty analyses.  The March 2010 jury
verdict however is different from the agreements relied upon by the experts in that Plaintiffs and
Applied were not "willing" participants in the jury verdict and indeed had no input on the $1 per
trocar royalty rate found by the jury.  *See Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372 (Fed.
Cir. 2010) ("To determine a reasonable royalty, a jury must find the royalty that would have been
agreed to in a hypothetical negotiation between a *willing* licensee and *willing* licensors at the
time infringement began.") (emphases added).  In the agreements relied upon by the experts,
even those that were prompted by ongoing litigation, the parties ultimately had a say in the
agreed-upon royalty rate.

Applied surpassed Tyco as the number two market player in unit market share in the first fiscal quarter of 2009 – a reasonable royalty in the Second Phase would necessarily be higher than that awarded by the jury in the First Phase.  Any evidence of the jury's damages award in the First Phase would therefore prejudice Plaintiffs' request for damages in the Second Phase, while being of no probative value to the assessment of a reasonable royalty in this Phase.

Finally, it is likely that the First Phase jury reached its reasonable royalty award on the basis of the trial testimony of Said Hilal[9] – testimony that Plaintiffs submit was knowingly false when given (D.I. 217 at 11-12) and that has since been recanted by Mr. Hilal during his Second Phase deposition.  (Hilal Dep. at 52:11-25 (Dec. 23, 2010), attached as Exhibit 9 to the Quarmby Decl.)  Allowing Applied to introduce evidence of this award would allow Applied to reap the benefit of its CEO's false testimony twice.  (*See* D.I. 217 (Plaintiffs' Motion for a New Damages Trial), incorporated herein by reference.)

Introducing evidence related to the invalidity and/or reasonable royalty verdict from the March 2010 trial would usurp *this* jury's role in this phase of the litigation in deciding the facts of this case.  Although the previous phase involved different patent claims, different accused products, and a different hypothetical negotiation period, the jury would likely be unduly swayed by the findings of the prior jury, resulting in prejudice to Plaintiffs.  This should not be permitted, especially when the March 2010 jury verdict has not even resulted in a final judgment.

Plaintiffs do not, however, seek the exclusion of *all* evidence of the First Phase proceedings.  Indeed, certain facts elicited during those proceedings lie at the very heart of the issues to be presented to the jury in the Second Phase.   By way of example, Applied has represented that its dual-thickness fingers are non-infringing alternatives to their current products

---

[9] (*See* Trial Tr. at 1001:9-22 ("Q. So, your bottom-line profit on each trocar on average would be about a dollar-forty? A. Yes, sir."); *see also* Am. Sims Rep. at 38-39.)

– a representation Applied's damages expert relies upon to reach his conclusions.  (Expert Report of James J. Nawrocki ("Nawrocki Report") at ¶¶ 24, 102 (Jan. 21, 2011), attached as Exhibit 4 to the Quarmby Decl.; *see also* D.I. 231 at 4.)  But that contention is directly contradicted by the finding of the jury in the First Phase of this case that the dual-thickness fingers septum shields infringe claim 6 of the Smith '377 patent.  (*See* Motion *In Limine* No. 6, *supra*.)  Plaintiffs should therefore have the opportunity to rebut Applied's contentions with evidence of that finding.

Similarly, Plaintiffs have consistently maintained that Applied tried for years to devise a non-infringing alternative to the asserted patents, but repeatedly failed to do so.  The jury's verdict of infringement in the First Phase provides concrete evidence of this failure, and establishes a secondary consideration of non-obviousness that Plaintiffs will seek to submit for the jury's consideration.  Applied's inability to successfully design around the patents-in-suit is also relevant to damages in this litigation.  For example, Applied's repeated failures to commercialize a trocar product without infringing the Green and Smith patents highlights the value of those patents and is therefore relevant to at least the jury's reasonable royalty analysis.

For these reasons, Plaintiffs respectfully request that the Court exclude all evidence, argument, and testimony relating to either the jury's verdict of invalidity of claims 12 and 13 of the Green '143 patent, or its reasonable royalty damages award in the First Phase of this action, without limiting the introduction of other evidence from that phase.

IX.    **MOTION *IN LIMINE* NO. 9: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Relating To The Existence And/Or Result Of *Applied I*, *Applied II*, Or *Applied III***

Pursuant to Federal Rules Of Evidence 401, 402, 403, and 404, Plaintiffs respectfully move this Court *in limine* to preclude Applied from soliciting or offering any testimony,

evidence, or argument relating to the existence and/or result of *Applied I*,[10] *Applied II*,[11] or *Applied III*.[12]

Plaintiffs made this same motion *in limine* in the first phase of this litigation, and incorporate by reference that motion in its entirety.  (Civil Action No. 9:06-cv-151, D.I. 199 at 4-8.)  The Court previously denied Plaintiffs' motion, asserting that the value of the Green and Smith patents was "inextricably linked" to the injunctions entered in the prior Applied litigation.[13]  (D.I. 63 at 4.)  For the reasons outlined in Plaintiffs' motion for reconsideration of the Court's order denying a permanent injunction (D.I. 140), Plaintiffs respectfully ask the Court to reconsider this motion *in limine* in this phase of the litigation.

The injunctions issued in *Applied I* and *Applied II* do not enjoin Plaintiffs from making or selling any and all products practicing the Green and Smith patents.  While Plaintiffs are currently enjoined from making certain products found to infringe certain of Applied's patents, Plaintiffs are not – and could not be – enjoined from practicing their own patents.  In fact, neither the injunction in *Applied I* nor the injunction in *Applied II* addresses any of Plaintiffs' patents.  Rather, those injunctions address only the patents asserted by Applied in those respective actions – and enjoin only specific products found to infringe Applied's patents.

---

[10]   *Applied Medical Resources Corp. v. United States Surgical Corp*, Civil Action No. 96-1217-A (E.D. Va.).

[11]   *Applied Medical Resources Corp. v. United States Surgical Corp*, Civil Action No. No. 99-625 (C.D. Cal.).

[12]   *Applied Medical Resources Corp. v. United States Surgical Corp*, Civil Action No. 03-1267 (C.D. Cal.).

[13]   The Court also agreed with Applied's argument that the prior litigations were relevant to the willfulness analysis.  Unlike the previous phase of the litigation, Applied's expert on willfulness issues, Andrew Dillon, has made no such argument in this phase of the litigation. (*See* Expert Rebuttal Report of Andrew J. Dillon (Jan. 21, 2011), attached as Exhibit 10 to the Quarmby Decl.)

Moreover, Plaintiffs' Green and Smith patents are patentably distinct from the Applied patents at issue in *Applied I* and *II*.[14]  It is a basic premise of patent law that only one valid patent can issue on the same invention.  35 U.S.C. § 101; *In re Vogel*, 422 F.2d 438, 441 (C.C.P.A. 1970).  Therefore, Applied's and Plaintiffs' patents claim different things.  Indeed, when Applied and USSC had concerns regarding the patentable distinctions between Applied's Ritchart '737 patent and USSC's Green patents, an interference was declared, and the patents were in fact held to be patentably distinct.  (PTX 670 at AP43717, attached as Exhibit 11 to the Quarmby Decl.; PTX 673 at AP43888, attached as Exhibit 12 to the Quarmby Decl.)

Applied's patents are thus not coextensive with Plaintiffs' Green and Smith patents.  Applied accordingly does not have any authority to practice the claims of the Green and Smith patents.  This is confirmed by the infringement verdict against Applied's dual-thickness finger trocar products in the March 2010 trial.  Indeed, Applied still requires a license to the Green and Smith patents to make its otherwise infringing products.  The injunctions issued in *Applied I* and *II*, which pertain to Applied's patents, are not "inextricably linked" to and have no bearing on the scope and value of Plaintiffs' Green and Smith patents.

For these reasons, Plaintiffs respectfully request that the Court preclude Applied from soliciting or offering any testimony, evidence, or argument relating to the existence and/or result of *Applied I*, *Applied II*, or *Applied III* to keep the jury focused on relevant issues, prevent the waste of time, and to avoid unfair prejudice to Plaintiffs.  Plaintiffs further respectfully request that, consistent with this motion, the Court order the parties to refrain from any mention of the existence and/or result of these prior litigations in connection with properly offered testimony

---

[14]   The Applied patents named in the *Applied I* injunction and/or the *Applied II* injunction are U.S. Patent Nos. 5,209,737 ("Ritchart '737 patent"), 5,308,336 ("Hart '336 patent"), and 5,385,553 ("Hart '553 patent").

and other evidence generated in those actions, and state only that such evidence was from prior

proceedings without identifying either party as the plaintiff or defendant, the subject matter, or

the result of such proceeding.

## X.   MOTION *IN LIMINE* NO. 10: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Concerning The IRISH Seal As Prior Art

Plaintiffs respectfully request that the Court exclude all evidence relating to the Irish seal

because it is an internal Applied prototype that does not constitute prior art under 35 U.S.C. §

102.   The Federal Circuit has repeatedly held that "[a]rt that is not accessible to the public is

generally not recognized as prior art." *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1305

(Fed. Cir. 2006); *see also OddzOn Prods. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed. Cir.

1997).

Applied's invalidity contentions and its experts' reports claim that the Irish seal should be

deemed invalidating prior art under Section 103.  (*E.g.*, Expert Report of Gerald R. Miller, Ph.D.

at 118, 136-40 (Jan. 7, 2011), attached as Exhibit 13 to the Quarmby Decl.)  However, it is

undisputed that the Irish Seal was never commercialized, was never made publicly available, and

was never disclosed in any printed publication.  It is merely a rough prototype assembled by

Applied trocar design engineers and promptly abandoned.  (Miller Dep. at 149:6-17 (Mar. 2,

2011), attached as Exhibit 14 to the Quarmby Decl.)  Moreover, Applied has not once alleged

that the Irish seal should somehow be deemed 102(g) art.[15]  Under the circumstances, the Irish

seal is not prior art under the aforementioned general rule, and the Section 102(g) exception does

---

[15]   Under 35 U.S.C. § 102(g), the invention disclosed by a patent may be invalidated if, before the invention thereof, "the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it," regardless of whether the earlier invention was publicly disclosed.  35 U.S.C. § 102(g).  Applied has never made this claim, and it is too late for it to do so now.

not apply.[16]  Any evidence of the Irish seal should therefore be excluded as irrelevant to the ultimate determination of validity of the asserted patents.

## XI.    MOTION *IN LIMINE* NO. 11: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Related to the Outsourcing or Exporting of Jobs or to the Foreign Status of Companies Affiliated with Plaintiffs

Testimony that Applied manufactures its products in the United States or that it does not outsource or export jobs has no bearing whatsoever as to whether the accused products infringe Plaintiffs' patents or as to any issue in this patent litigation.  Nor does the fact that Plaintiffs have a foreign-based parent company or foreign affiliates.  Any reference to the outsourcing or exporting of jobs or to the foreign status of companies affiliated with Plaintiffs is irrelevant and threatens to evoke local bias.  Plaintiffs therefore request that any such testimony or attorney argument be excluded on the grounds that it is irrelevant or, alternatively, that its negligible probative value is far outweighed by the danger of unfair prejudice.  *See* FED. R. EVID. 402 & 403.

Courts have repeatedly condemned attempts to appeal to local bias or to foster an atmosphere of hostility toward foreign corporate parties.  *See New York Cent. R.R. Co. v. Johnson*, 279 U.S. 310, 319 (1929) (citing cases); *O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*, No. 04-32, 2009 U.S. Dist. LEXIS 58860, at *9 (E.D. Tex. July 10, 2009) (finding that counsel's reference during voir dire to an opposing party's motivation for incorporating in the Cayman Islands "has undermined the parties' expectations to a trial by a jury selected from the panel summoned according to the regular process of the court").  To guard against the possibility that the jury will be tainted by local bias, courts exclude any irrelevant reference to a party's foreign status.  *See Cummins-Allison Corp. v. Glory Ltd.*, No. 02-7008, 2007 U.S. Dist. LEXIS 100594,

---

[16]   Even if Applied were to allege that the Irish seal were prior art under 102(g), it abandoned the design, and the exception still should not apply.

at *6 (N.D. Ill. Mar. 5, 2007).  Courts similarly proscribe the making of comments that draw attention to the fact that a corporate party has a foreign parent company or foreign affiliates.  *See Gearhart v. Uniden Corp. of Am.*, 781 F.2d 147, 153 (8th Cir. 1986) ("[W]e believe such repeated references to Far Eastern parent corporations and 'foreign goods' or 'foreign products' . . . could prejudicially appeal to xenophobia and the current United States-Japanese trade imbalance."); *Dyson Tech. Ltd. v. Maytag Corp.*, No. 05-434, 2009 U.S. Dist. LEXIS 55267, at *8-9 (D. Del. May 25, 2009).

During his recent deposition, Applied's chief executive officer testified that Applied avoids "outsourcing or exporting work and jobs."  (Hilal Dep. at 28:3-6 (Dec. 23, 2010), attached as Exhibit 9 to the Quarmby Decl.)  This testimony occurred in the context of Mr. Hilal's characterization of Applied as being a vertically integrated company – one that prefers to conduct business "within the confines" of the California-based company.  In contrast, Plaintiffs' parent company is based in Ireland, and Plaintiffs and their foreign affiliates employ foreign workers at facilities in over 100 countries.  Plaintiffs anticipate that Applied will use these facts at the upcoming trial in an attempt to cause unfair prejudice – similar to the March 2010 trial when counsel for Applied made repeated gratuitous references to Covidien's foreign status in opening statements, cross examinations, and closing arguments.  (*See, e.g.*, Trial Tr. at 182:7-9 ("Covidien, you know, is a big parent company based in Ireland, I think . . . ."), 729:15-732:20, 2154:11-13 ("This is a company home based in Ireland, based in the U.S. and Connecticut, suing our company that's in California; and they're here in Beaumont."), attached as Exhibit 1 to the Quarmby Decl.)

Whether or not a party in this case outsources or exports jobs or has foreign affiliates or foreign business operations is irrelevant to the parties' claims and defenses.  The danger of unfair

prejudice to Plaintiffs posed by any reference to these matters far outweighs their negligible

probative value.

## XII.   MOTION *IN LIMINE* NO. 12: Applied Should Be Precluded From Soliciting Or Offering Any Testimony, Evidence Or Argument Suggesting That Tyco Has Invited Applied To Sell Trocars To Existing Tyco Accounts

In his expert report, Applied damages expert, James Nawrocki, asserts that "in certain

instances Tyco has even referred trocar business to Applied and/or requested Applied's

assistance to help Tyco maintain its overall bundled business or acquire new accounts."  (Expert

Report of James J. Nawrocki ("Nawrocki Report") at ¶ 56 (Jan. 21, 2011), attached as Exhibit 4

to the Quarmby Decl.)  This assertion, however, has no support whatsoever from any witness.

During depositions in this matter, Applied repeatedly asked Tyco employees whether they were

aware of  any situations in which Tyco sales representative invited Applied to sell trocars to

existing Tyco accounts.  As seen in the excerpted deposition testimony below, Tyco employees

repeatedly testified that they had no awareness of such situations:

> Q.  Are you aware of any situations where a Tyco sales rep invited Applied to come in and sell trocars to an account to help Tyco get other endomechanical business?
> A.  I don't understand. Could you rephrase that?
> Q.  Yes. Are you aware of any situations where a Tyco salesperson invited somebody from Applied to come in and to help Tyco get an endomechanical account where Tyco -- I'm sorry.   Are you aware of any situations where a Tyco salesperson invited somebody from Applied to come in to help Tyco get an endomechanical account whereby Applied would sell trocars to that account and Tyco would sell other endomechanical products?
> A.  No, I'm not aware of any.

(Wilson Dep. at 46:2-16 (Feb. 22, 2011), attached as Exhibit 15 to the Quarmby Decl.)

> Q.  Are you aware of any situations where a Tyco representative or Covidien representative has asked Applied or one of its representatives to come into an account to sell trocars?
> A.  I'm not aware of any specific situations where that's occurred.

28

(Toomey Dep. at 66:19-67:2 (Feb. 22, 2011), attached as Exhibit 16 to the Quarmby Decl.)

> Q. Are you aware of any situations where a Tyco representative asked Applied to come in to sell trocars to an existing account so that Tyco could maintain endo -- other endomechanical business with that account?
> A. No.

(Corradi Dep. at 93:17-21 (Feb. 23, 2011), attached as Exhibit 17 to the Quarmby Decl.)

In fact, Applied damages expert, James Nawrocki, admitted at his deposition that he had no Tyco source for this information:

> Q. Did you find any evidence, other than [Applied employee] Mr. Johnson said so, for Tyco ever referring business to Applied in the trocar area or desiring Applied to make trocar sales?
> A. I don't recall if there's anything in the documents produced by Tyco saying just that. I understand that they regarded certainly Ethicon as a major competitor, and I don't recall anything that specifically would have said that, though.

(Nawrocki Dep. at 167:13-22 (Mar. 30, 2011), attached as Exhibit 18 to the Quarmby Decl.)  His only source, Mr. Johnson, only relied on hearsay for his conclusions about Tyco's activities in the market:

> Q. So what direct evidence could he possibly have about Tyco's thought process since he's never worked there, there's no document that shows Tyco having this thought process that he's speculating about. How could he possibly know, and why isn't it just pure rank speculation?
>                              *    *    *
> A. I relied upon Mr. Johnson's testimony. My understanding is the possible source of his information is contact that he has with the marketplace through people in his either sales organization or people at Applied that are in contact with the customers.

(*Id.* at 169:15-20, 169:23-170:3.)

Having no support for the assertion that Tyco has invited Applied to sell to existing Tyco accounts, Applied should not be allowed to present testimony or evidence on this assertion before the jury at the upcoming trial.  Applied is well aware that it lacks support in arguing that

Tyco has brought one of its major competitors into its accounts to sell trocar products.  Applied's only purpose in making this argument therefore would be to deliberately mislead the jury to Plaintiffs' direct prejudice.  Pursuant to Federal Rule of Evidence 403, the Court should therefore exclude any argument, testimony, or evidence suggesting that Tyco has invited Applied to sell trocars to existing Tyco accounts.

Dated:  April 7, 2011                    Respectfully submitted,


/s/ Robert Christopher Bunt
Peter J. Armenio, P.C. (admitted *pro hac vice*)
Sandra A. Bresnick (admitted *pro hac vice*)
Richard W. Erwine NY SBN: 2753929[*]
Mark D. Baker NY SBN: 4158747[*]
Benoit Quarmby NY SBN: 4298725[*]
[*](admitted to practice in the Eastern District of Texas)
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: peterarmenio@quinnemanuel.com
Email: sandrabresnick@quinnemanuel.com
Email: richarderwine@quinnemanuel.com
Email: markbaker@quinnemanuel.com
Email: benquarmby@quinnemanuel.com

Robert M. Parker SBN: 15498000
Robert Christopher Bunt SBN: 00787165
PARKER, BUNT & AINSWORTH, P.C.
100 E. Ferguson, Suite 1114
Tyler, Texas  75702
Telephone: (903) 531-3535
Facsimile: (903) 533-9687
Email: rmparker@pbatyler.com
Email: rcbunt@pbatyler.com

Claude E. Welch SBN: 21120500
Law Office of Claude E. Welch
P.O. Box 1574
Lufkin, Texas  75902-1574
Telephone: (936) 639-3311
Facsimile: (936) 639-3049
Email: welchlawoffice@consolidated.net

Attorneys for Plaintiffs
TYCO HEALTHCARE GROUP LP and
UNITED STATES SURGICAL CORPORATION

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on all counsel of record on April 7, 2011 who are deemed to have consented to electronic service via the Court's CM/ECF system.

By: */s/ Robert Christopher Bunt*

Robert Christopher Bunt

## CERTIFICATE OF CONFERENCE

Pursuant to the Court's Order, I certify that on April 1, 2011 counsel for the parties met and conferred by telephone about the subject matter of this motion.  This motion is opposed. Participants on the conference included Peter Armenio, Ben Quarmby, William Adams, and Laura Fairneny (counsel for Plaintiffs) and Joseph Re, Joseph Jennings, Karen Weil, Matt Bellinger, Sean Murray, and Mark Kachner (counsel for Defendant).  No agreement could be reached.  Tom Gorham and Chris Bunt, local counsel for Plaintiffs, met and conferred again on March 7, 2011 via telephone with Mitch Smith, local counsel for Defendant.  Applied did not agree to any of Plaintiffs' motions *in limine*, but the parties have an open dialog on the issues contained in the motions, intend to continue these discussions, and hope to reach agreements on some of the motions before the final pretrial hearing.

By: */s/ Robert Christopher Bunt*

Robert Christopher Bunt