## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | |
|---|---|
| TYCO HEALTHCARE GROUP LP and UNITED STATES SURGICAL CORPORATION, | ) ) ) ) | Civil Action No. 9:09-CV-176 |
| *Plaintiffs,* | ) ) | The Honorable Keith F. Giblin |
| v. | ) ) | |
| APPLIED MEDICAL RESOURCES CORPORATION, | ) ) ) | |
| *Defendant.* | ) ) | |

**APPLIED'S OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION *IN LIMINE***

**(NOS. 1-12)**

### TABLE OF CONTENTS

Page No.

I.   OPPOSITION TO MOTION *IN LIMINE* NO. 1: Plaintiffs, And Not
     Applied, Are Trying To Make Mr. Hilal's Religious Beliefs Or Affiliations
     An Issue ............................................................................................................1

II.  OPPOSITION TO MOTION *IN LIMINE* NO. 2: Applied  Should Be
     Permitted To Rebut Plaintiffs' Legally Erroneous And Factually Incorrect
     Inference That Applied Did Not Seek Or Obtain Legal Advice...........................3

III. OPPOSITION TO MOTION *IN LIMINE* NO. 3: Plaintiffs' Failure To Sue
     Ethicon For Infringement Of The Patents In Suit Is Relevant To The Value
     Of Those Patents..............................................................................................5

IV.  OPPOSITION TO MOTION *IN LIMINE* NO. 4: Applied Should Be
     Allowed To Present Evidence Or Argument Relevant To Issues To Be
     Decided By The Jury Even If The Issues Are Also Relevant To Applied's
     Inequitable-Conduct Defense.............................................................................7

V.   OPPOSITION TO MOTION *IN LIMINE* NO. 5: Applied Should Be
     Allowed To Present Any Alleged Non-Infringing Alternative, Even If It Has
     Never Been Sold ..............................................................................................8

VI.  OPPOSITION TO MOTION *IN LIMINE* NO. 6: Applied Should Be
     Permitted To Present Evidence That Trocars With Its Uniformly Thin
     Leaflets and Ethicon's Trocars Are Non-Infringing Alternatives.....................11

VII. OPPOSITION TO MOTION *IN LIMINE* NO. 7: Applied Correctly
     Analyzed The Claims In Its Summary Judgment Motion On Collateral
     Estoppel..........................................................................................................14

VIII. OPPOSITION TO MOTION *IN LIMINE* NO. 8: The Entire Jury Verdict
     From The March 2010 Trial Is Admissible ......................................................16

IX.  OPPOSITION TO MOTION *IN LIMINE* NO. 9: This Court Already
     Correctly Decided That *Applied I* and *II* Are Relevant ..................................22

X.   OPPOSITION TO MOTION *IN LIMINE* NO. 10: Applied Should Be
     Allowed to Present The Irish Seal As Prior Art Or A Contemporaneous
     Invention ........................................................................................................24

XI.  OPPOSITION TO MOTION *IN LIMINE* NO. 11: Applied Should Be
     Allowed To Present Evidence And Argument Related To Plaintiffs'
     Outsourcing Or Exporting Of Jobs And The Foreign Status Of Companies
     Affiliated With Plaintiffs ................................................................................25

XII. OPPOSITION TO MOTION *IN LIMINE* NO. 12: Applied Will Not Offer Any
     Testimony Or Evidence Suggesting That Tyco Has Invited Applied To Sell
     Trocars To Existing Tyco Accounts .................................................................27

## TABLE OF AUTHORITIES

Page No.

*Anascape, Ltd. v. Microsoft Corp.,*
    No. 9:06-CV-158, 2008 WL 7182476 (E.D.Tex. Apr. 25, 2008) (Clark, J.).......................5

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
    377 U.S. 476 (1964)...........................................................................................................11

*BIC Leisure Prods. v. Windsurfing Int'l,*
    1 F.3d 1214 (Fed. Cir. 1993)............................................................................................17

*Bourns, Inc. v. United States,*
    537 F.2d 486 (Ct. Cl. 1976) .................................................................................15, 16, 19

*Butler v. Dagney,*
    No. TH98-0196, 2001 WL 521821 (S.D. Ind. Mar. 5, 2001) .............................................2

*Concrete Appliances Co. v. Gomery,*
    269 U.S. 177, 46 S. Ct. 42, 70 L. Ed. 222 (1925)............................................................25

*Flex-Rest, LLC v. Steelcase, Inc.,*
    455 F.3d 1351 (Fed. Cir. 2006).......................................................................................24

*Geo M. Martin Co. v. Alliance Mach. Sys. Int'l LLC,*
    618 F.3d 1294 (Fed. Cir. 2010).......................................................................................24

*Georgia-Pacific Corp. v. United States Plywood Corp.,*
    318 F. Supp. 1116 (S.D.N.Y. 1970)........................................................................ passim

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966).................................................................................................15, 16, 19

*Grain Processing Corp. v. American Maize-Products Co.,*
    185 F.3d 1341 (Fed Cir. 1999)................................................................................ passim

*Grain Processing Corp. v. American Maize-Products Co.,*
    979 F. Supp. 1233 (N.D. Ind. 1997), *aff'd* 185 F.3d 1341 (Fed. Cir. 1999)...............11, 12

*In re Kaplan,*
    789 F.2d 1574 (Fed. Cir. 1986).......................................................................................23

*In re Seagate Tech., LLC,*
    497 F.3d 1360 (Fed. Cir. 2007)..................................................................................3, 4, 5

*Interconnect Planning Corp. v. Feil,*
    774 F.2d 1132 (Fed. Cir. 1985).................................................................................18, 19

## TABLE OF AUTHORITIES
(continued)

Page No.

*Jamesbury Corp. v. Litton Industrial Products, Inc.*,
    839 F.2d 1544 (Fed. Cir. 1988)..................................................................................6, 7

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    383 F.3d 1337 (Fed. Cir. 2004)..............................................................................3, 4, 5

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,
    976 F.2d 1559 (Fed. Cir. 1992)..................................................................................12

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) ...............................................................................25, 26

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*,
    225 F.3d 1349 (Fed. Cir. 2000)....................................................................................8

*Spectralytics, Inc. v. Cordis Corp.*,
    650 F. Supp. 2d 900 (D. Minn. 2009) ..........................................................................11

*Stripling v. Jordan Prod. Co.*,
    234 F.3d 863 (5th Cir. 2000) ...............................................................................14, 15

*United States v. Deel*,
    No. 09-22, 2010 WL 519836 (W.D. Va. Feb. 11, 2010) ...................................................2

*Westwood Chemical, Inc. v. United States*,
    525 F.2d 1367 (Ct. Cl. 1975) ....................................................................................19

## OTHER AUTHORITIES

35 U.S.C. § 103..........................................................................................................16, 19

Fed. R. Evid. 106 ..........................................................................................................17

Defendant Applied Medical Resources Corporation ("Applied") hereby opposes Plaintiffs Tyco Healthcare Group LP's and United States Surgical Corporation's (collectively "Plaintiffs") Omnibus Motion *in Limine*, as set forth below.

## I.  OPPOSITION TO MOTION *IN LIMINE* NO. 1: PLAINTIFFS, AND NOT APPLIED, ARE TRYING TO MAKE MR. HILAL'S RELIGIOUS BELIEFS OR AFFILIATIONS AN ISSUE

Plaintiffs' motion *in limine* no. 1 is misleadingly captioned to "exclude all evidence, testimony, and argument regarding religious beliefs or affiliation."  However, nowhere do Plaintiffs discuss the religious beliefs or affiliation of any witness.  Instead, Plaintiffs' sole focus is on the educational history of one of Applied's witnesses, Mr. Said Hilal, who attended high school in Lebanon at the "Good Shepherd Protestant School."  The identity of Mr. Hilal's high school does not reveal his religious beliefs or affiliation, but rather is simply part of his educational background.  Attendance at high school is a relevant part of Mr. Hilal's personal background.  Indeed, it was common for the parties to allow virtually every witness to discuss their prior education.  For example, Plaintiffs asked their damages expert to tell the jury that he went to "Lubbock High School in Lubbock, Texas."  Ex. 1[1] at 787:25 – 788:7.  Some witnesses even testified about their families and interests.

Plaintiffs' questioning of Mr. Hilal during his deposition reveals that it is *Plaintiffs*, and *not* Applied, who are interested in the completely separate issue of Mr. Hilal's religious beliefs or affiliations:

```
[BY PLAINTIFFS' COUNSEL]
Q Now, I'm going to ask you a -- a -- potentially a couple
questions, sir, that came up at -- at trial, and it was
mentioned a couple of times, where you attended high
school.

A Yes.

Q And you attended the Good Shepherd Protestant School, if
I remember correctly?
```

---

[1] All exhibits referenced herein are attached to the Declaration of Sean M. Murray filed concurrently herewith.

```
A Yes, sir.

MR. ARMENIO: And, Counsel, I'll address this question to
you.  If Mr. Hilal is not going to testify about his
attendance at that school, I'm not going to ask him the
next series of questions.  If he is, I feel I have to, even
though I would not ask questions about such things
ordinarily.

MR. JENNINGS: I don't know what you're talking about.

MR. ARMENIO: Okay.
Well, so I have -- I have to ask, sir, since  it -

THE WITNESS: Sure.

MR. ARMENIO: -- was -- it was brought up a couple of times
by Mr. Germer.

BY MR. ARMENIO:
Q Are you, yourself, a practicing member of any religion?

A It's none of your business, sir.
```

Ex. 2 at 57:19 – 58:20 (emphasis added).

As the deposition transcript reveals, the identity of Mr. Hilal's high school does not reveal Mr. Hilal's religious beliefs or affiliations.  Plaintiffs' entirely separate (and altogether improper) inquiries into Mr. Hilal's religious beliefs or affiliations reveal that it is Plaintiffs who hope to improperly inject religion into this case.

None of the authorities cited by Plaintiffs support the proposition that a witness should be precluded from providing his educational background to the jury.  Indeed, the lead case cited by Plaintiffs actually permitted such testimony.  *United States v. Deel*, No. 09-22, 2010 WL 519836, *1 & n. 2 (W.D. Va. Feb. 11, 2010)  ("I will allow a defendant who testifies to give a brief and straight-forward recitation of his life history, including employment and family details, simply as background evidence for the jury's benefit to judge his credibility.").  Other courts have ruled consistently.  *See, e.g.*, *Butler v. Dagney*, No. TH98-0196, 2001 WL 521821, at *9 (S.D. Ind. Mar. 5, 2001) ("[T]he educational background or professional status or employment position of a non-expert witness may be asked . . . . These questions give the jury some knowledge of the individual and a more complete perspective in considering his testimony.").

Indeed, Plaintiffs ask this Court to essentially adopt a far-reaching rule that would exclude the mention of any educational institution simply because its name may be associated with a religion.  Prominent schools such as Southern Methodist University, Texas Christian University, Texas Lutheran University, Texas Bible College, University of Notre Dame, and Catholic University of America could not be mentioned simply because of their names.  Of course, the mere mention of one's affiliation with an institution whose name may be associated with a religion does not reveal one's religious beliefs or affiliations.  In fact, the first thing elicited by Plaintiffs from their first witness, Dr. Reardon, was that he practices medicine at the "Methodist Hospital" in Houston.  Ex. 1 at 212:1-3.

Applied has no intentions of asking any witness about his or her religious beliefs or affiliations, and Plaintiffs' motion does not demonstrate otherwise.  Accordingly, Applied respectfully requests that the Court deny Plaintiffs' motion *in limine* no. 1 to the extent that it would preclude any witness from providing his or her educational background.

## II.  OPPOSITION TO MOTION *IN LIMINE* NO. 2: APPLIED  SHOULD BE PERMITTED TO REBUT PLAINTIFFS' LEGALLY ERRONEOUS AND FACTUALLY INCORRECT INFERENCE THAT APPLIED DID NOT SEEK OR OBTAIN LEGAL ADVICE

Plaintiffs argue that Applied has willfully infringed the Smith patents because Applied allegedly did not seek and follow legal advice before introducing the product now accused of infringing those patents.  In this remarkable motion *in limine* Plaintiffs now seek to prevent Applied from showing the premise of Plaintiffs' argument is false.  The Federal Circuit's *en banc* decisions in *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004), and *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007), preclude precisely the type of Catch-22 that Plaintiffs hope to create here.

Plaintiffs contend that Applied has willfully infringed the Smith patents by making and selling trocar products that include Applied's pleated skirt septum shield.  The pleated skirt septum shield was designed during the course of this litigation.  Plaintiffs and their retained legal expert, Jack Goldstein, Esq., are inferring, based upon the fact Applied has not waived the

privilege and is not relying upon legal advice to rebut the willfulness charge, that Applied did not obtain any such legal advice.  Applied maintained the privilege because it does not plan to rely upon advice of counsel to rebut the willfulness charge.  But that does not permit Plaintiffs now to wrongly infer that Applied did ***not*** seek or obtain any legal advice.  If they do, Applied must be permitted to show Plaintiffs' inference is ***factually*** incorrect.   Otherwise, Plaintiffs would succeed in trying the case under a false premise.  The cases Plaintiffs cite are inapposite - in none of them did the patentee attempt to take advantage of a false inference as Plaintiffs plan to do here.

This motion *in limine* highlights the legal error in Plaintiffs' willful infringement theory.  As explained in Applied's motion *in limine* no. 16 (D.I. 274 at 26), the inference Plaintiffs hope to draw is ***legally*** incorrect.  Since 2004, the *en banc* Federal Circuit has made it clear that the law does ***not*** permit a patentee to draw such inferences from a party's invocation of the attorney-client privilege or work-product immunity.  *See Knorr-Bremse Systeme*, 383 F.3d at 1344-45 ("no adverse inference shall arise from invocation of the attorney-client and/or work product privilege").  As explained in Applied's motion *in limine* no. 16, the Court should preclude Plaintiffs from arguing (or their expert witness from opining) that Applied did not obtain legal advice in connection with its pleated skirt septum shield.  If this Court properly bars Plaintiffs from drawing adverse inferences contrary to *Knorr-Bremse*, this solves Plaintiffs' instant motion *in limine* as well.  If Plaintiffs make no reference to supposed need for legal opinions,[2] or the alleged fact that Applied did not obtain or follow legal advice in connection with its pleated skirt product designed during the course of this litigation, Applied will have no need to show Plaintiffs are wrong.

Applied recognizes that this Court previously ruled in the last phase of this case that a jury "can hear testimony that a defendant did not seek advice of counsel in determining whether, under the totality of circumstances, any infringement by the defendant was willful."  D.I. No.

---

[2] *In re Seagate*, 497 F.3d at 1371 ("no affirmative obligation to obtain opinion of counsel").

190 (in Civil Action No. 06:CV-151) at 5.  Applied respectfully disagrees with that ruling for the reasons previously argued,[3] but that ruling has nothing to do with this case.  Those are not the facts here.  The product at issue in Plaintiffs' current willful infringement claim was designed during the course of this litigation with full knowledge of this case *and* while Applied was consulting with its legal team on a near daily basis.  Applied has chosen to maintain the privilege.  And from that, Plaintiffs and Mr. Goldstein improperly inferred that Applied did not seek legal advice.

If this case proceeds to trial, there should be *no evidence* introduced regarding the alleged need for legal advice or whether Applied did or did not seek, obtain and/or follow legal advice.  For if Tyco were permitted to argue that Applied should have obtained legal advice or that Applied supposedly did not seek, obtain and/or follow legal advice in connection with the product accused of infringement, that result would be both unfair and plain legal error under *Knorr-Bremse* and *In re Seagate.*  Under those circumstances, at a minimum, Applied should be entitled to show Plaintiffs' premise is contrary to the evidence to mitigate the prejudice to Applied.

### III.  OPPOSITION TO MOTION *IN LIMINE* NO. 3: PLAINTIFFS' FAILURE TO SUE ETHICON FOR INFRINGEMENT OF THE PATENTS IN SUIT IS RELEVANT TO THE VALUE OF THOSE PATENTS

For years, Ethicon, a division of Johnson & Johnson, has been the leader in the trocar market, occupying market shares between 50% and 80%, through its sales of its OneSeal and Xcel lines of trocars.  Both of those trocar lines included a septum shield with overlapping flexible plastic guard members.  Plaintiffs admit that they have never attempted to enforce the patents in suit against Ethicon.  Indeed, Plaintiffs admit they have never even contacted Ethicon about possible infringement by either the OneSeal or the Xcel trocars.  Ex. 3 at 4-5.

---

[3] In addition, this Court has also held that "the failure to obtain opinion of counsel is not a factor supporting willful infringement."  *Anascape, Ltd. v. Microsoft Corp.,* No. 9:06-CV-158, 2008 WL 7182476, at *4 (E.D.Tex. Apr. 25, 2008) (Clark, J.).

In this litigation, Plaintiffs have refused to take a position one way or the other whether Ethicon's Xcel trocars are covered by any of the patents in suit. *Id.* at 2-3; Ex. 4. Regardless of whether they infringe, the prominence of Ethicon's trocars in the marketplace and the fact that Plaintiffs have never asserted their patents against Ethicon is highly relevant to the value of any alleged improvements claimed in Plaintiffs' patents in suit. On the one hand, if Ethicon's trocars do not infringe Plaintiffs' patents, then the shield design used by Ethicon in those two trocar lines may be an available non-infringing alternative design that would preclude Plaintiffs from obtaining lost profits against Applied here. *See Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1350-51 (Fed Cir. 1999) (reconstruction of 'but for' market must take into account alternative actions the infringer foreseeably would have undertaken had he not infringed). This scenario would also impact the reasonable-royalty analysis, as the availability of noninfringing alternatives is evidence relevant to the utility and advantages of the patent over any other trocars. *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (factors 9 and 10).

On the other hand, if Ethicon's trocars infringe Plaintiffs' patents, then Plaintiffs' failure to take any action against the market leader also speaks volumes about the value of Plaintiffs' patents. Plaintiffs' choice not to enforce its patents against a known infringer—indeed the dominant player in this market—is evidence that Plaintiffs do not value their patents, do not maintain their patent monopoly, and freely allow their largest competitor a free pass to use their patented technology. *Id.* (factors four and five).

Contrary to Plaintiffs' arguments, Plaintiffs' enforcement history regarding the patents in suit is highly relevant to the availability of non-infringing alternatives, and significantly bears on Plaintiffs' ability to claim lost profit and reasonable-royalty damages. The holding in *Jamesbury Corp. v. Litton Industrial Products, Inc.*, 839 F.2d 1544 (Fed. Cir. 1988), does not support Plaintiffs' motion. There, the court held a patentee's involvement in other litigations may serve as a defense to laches only "if the infringers understood there was no intent to condone their infringements." *Id.* (requiring explicit notice of earlier litigation to excuse delay in filing

subsequent suit), *overruled in part on other grounds by A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1038-39 (Fed. Cir. 1992).  Applied has not asserted laches or equitable estoppel based on Plaintiffs' inaction towards Ethicon.  The holding in *Jamesbury* thus has no bearing on Applied's ability to rely on Plaintiffs' inactivity towards Ethicon, particularly because the inactivity is relevant to issues other than laches and equitable estoppel.

Finally, the availability of the Ethicon trocar shield designs is a fact issue for the jury. Contrary to Plaintiffs' suggestion, Applied never admitted that the seal in the Xcel trocar is covered by an Ethicon patent—instead Jeremy Albrecht merely stated that Ethicon's Xcel product resembles the product depicted in a figure in one of Ethicon's patents, and that it was safe to assume that Ethicon has patents covering some features of its products.  Ex. 5 at 109:5-110:17 and 111:2-8.  This is very far from an admission that Applied could not adopt the seal design in the Ethicon Xcel trocar.

Plaintiffs' tacit approval of Ethicon's OneSeal and Xcel shield designs is directly relevant to the availability of Ethicon's designs as non-infringing alternatives, the value of the patents in suit, and the damages Plaintiffs could possibly claim for any infringement.

### IV.  OPPOSITION TO MOTION *IN LIMINE* NO. 4: APPLIED SHOULD BE ALLOWED TO PRESENT EVIDENCE OR ARGUMENT RELEVANT TO ISSUES TO BE DECIDED BY THE JURY EVEN IF THE ISSUES ARE ALSO RELEVANT TO APPLIED'S INEQUITABLE-CONDUCT DEFENSE

Applied agrees that its inequitable-conduct defense will be the subject of a separate bench trial and will not be decided by the jury.  Plaintiffs knew that before they filed this motion.  For example, Applied stated in the Joint Pretrial Order that inequitable conduct "is an equitable issue for the Court in the circumstances of the present case."  *See* D.I. 271 at p. 14 (Applied's Contested Issues of Fact and Law No. 6).

Applied opposes the motion only to the extent that it seeks to preclude Applied from presenting evidence at trial that, while relevant to Applied's inequitable-conduct defense, is also relevant to other issues the jury will decide.  For example, Applied should be permitted to present the fact to the jury that the Green '854 patent examiner did not consider the prior art

Yoon patent.  That fact, while relevant to Applied's inequitable-conduct defense, is also relevant to Applied's invalidity defense.  *See*, *e.g.*, *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355-56 (Fed. Cir. 2000) ("While the presentation at trial of a reference that was not before the examiner does not change the presumption of validity, the alleged infringer's burden may be more easily carried because of this additional reference.").

Plaintiffs single out in their motion one of Applied's patent practice and procedure experts, Mr. Pete Peterson.  Mot. at 10.  However, Mr. Peterson is not offering opinions about whether inequitable conduct was committed during prosecution of the Green '854 patent.  He intends to offer testimony regarding the prosecution of the Green patents and the interference proceeding involving the Green '854 patent application that is relevant to the issue of patent invalidity.[4]  Thus, Mr. Peterson should be permitted to testify before the jury even though Applied's inequitable-conduct defense will be decided by the Court.

In sum, Applied opposes Plaintiffs' motion to the extent that it seeks to preclude Applied from presenting evidence or argument that is relevant to issues the jury will decide under the guise that such evidence or argument may ***also*** be relevant to Applied's inequitable-conduct defense.  Applied, however, does agree that the Court, and not the jury, will decide that inequitable-conduct defense.

## V.  OPPOSITION TO MOTION *IN LIMINE* NO. 5: APPLIED SHOULD BE ALLOWED TO PRESENT ANY ALLEGED NON-INFRINGING ALTERNATIVE, EVEN IF IT HAS NEVER BEEN SOLD

Plaintiffs' motion is premised on the faulty legal principle that, for a design to qualify as an acceptable non-infringing alternative for purposes of a damages analysis, that design must have been "on the market" during the damages period.  Mot. at 11 (motion captioned as one to preclude evidence regarding any alleged non-infringing alternative that has never been available "on the market").  Plaintiffs are wrong.  As Plaintiffs acknowledge, in *Grain Processing Corp. v.*

---

[4] For a more detailed discussion on Mr. Peterson's testimony, see Applied's Opposition to Plaintiffs' Motion to Strike the Testimony of Mr. Gale R. Peterson (D.I. 237).

*American Maize-Products Co.*, the Federal Circuit held that "to be an acceptable non-infringing substitute, [a] product or process must have been available *or* on the market at the time of infringement."  185 F.3d at 1349 (emphasis added).  By use of the word "or," the Court clearly contemplated that "available" means something different than "on the market."  Indeed, in *Grain Processing*, the Federal Circuit held that products developed after the beginning of the damages period may still be deemed "available" for purposes of defeating a claim for lost profits.  *Id.* at 1356.  In fact, in *Grain Processing,* the district court found that products developed **17 years after** the beginning of the damages period were nevertheless "available" and "acceptable" and precluded lost profits because the defendant demonstrated that (1) it could readily obtain all of the materials needed for the alternative; (2) the non-infringing alternative was well-known in the field during the damages period; (3) it had all of the necessary equipment, know-how and experience to make the alternative during the damages period; and (4) it did not have to "invent around the patent," it only had to use something it already had.  *Id.*  at 1354.

Furthermore, Applied is not relying upon unspecified designs to defeat Plaintiffs' damages claim.  Rather, Applied is pointing to very specific designs that it is free to use in any trocar with a septum shield.  Plaintiffs quote only from the report of Applied's damages expert, James Nawrocki, as if his testimony is the evidence Applied is offering to show the existence of non-infringing alternative designs.  Mot. at 11.  However, Applied presented detailed opinions of its technical expert, Dr. Gerald Miller, about the availability of numerous non-infringing alternative designs.  Ex. 6 at ¶¶ 75-94.  Many of the alternative designs are ones that have been commercialized.  Such products include Applied's 5 mm Spartan trocars, Applied's 5 mm Kii trocars with no septum shield, Applied's non-accused 12 mm Kii trocars with a polyethylene sleeve covering the septum shield, Ethicon's Xcel trocar, and Ethicon's OneSeal trocar.  *Id.* at ¶¶ 75-86.  Plaintiffs do not seek to exclude any of these numerous alternative designs in their motion.

Dr. Miller also opines about other designs that are acceptable non-infringing alternatives, even though the designs may not have been commercialized.  Those designs include guard

members described in other prior art patents, such as U.S. Patent No. 5,342,315 to Rowe.  *Id.* at ¶ 87.  Dr. Miller also explains that using guard members to protect a seal from tearing or to assist in opening the seal was in the public domain in view of the fact that Claims 12 and 13 of the Green '143 patent were found invalid.  *Id.* at ¶ 88.  The presently asserted Green patent claims are more limited in scope and relate to trivial design features.  Any design that does not fall within those narrow claims is by definition a non-infringing design.  Dr. Miller explains that there are many different design alternatives for the trivial features recited in the newly asserted Green patent claims, such as how the valve is attached to the housing.  *Id.* at ¶¶ 88-94.

All of those designs, even if never commercialized, are available alternatives under the factors set forth in *Grain Processing*.  185 F.3d at 1354.  First, Applied could readily obtain all of the materials needed for the alternatives.  The materials used to make seal protectors and valves were well-known.  Second, the alternative designs described by Dr. Miller were well-known in the field during the damages period.  Dr. Miller explains that numerous prior art references describe alternative designs to the features set forth in the asserted claims.  Ex. 6 at ¶¶ 90-92.  Third, there can be no dispute that Applied had the necessary equipment and know-how to implement the alternative designs.  The designs would involve making trivial changes, such as how the valve is connected to the housing.  Fourth, there was no need to invent around the asserted patents to implement the alternatives.  Again, the alternative designs require nothing more than making trivial changes to implement designs that were well-known in the prior art.

In an effort to elevate the trivial claims at issue in this case, Plaintiffs contend that making changes to a trocar design is a long and arduous process requiring FDA approval.  But they have no support whatsoever for their statements, particularly for the type of changes at issue in this case.  Indeed, the evidence will show that trivial designs changes to the septum shield, many of which Applied has implemented in the accused devices, do ***not*** require FDA approval.  Moreover, the evidence will also show that Applied has numerous designs and products to protect the elastomeric septum valve.  Regardless, the factual inquiry of whether a design was an

available non-infringing alternative should be left to the jury and not decided on a motion *in limine*.

For example, prior to the March 2010 trial, Plaintiffs attempted to exclude exhibits relating to certain alternative trocar designs developed by Applied.  Plaintiffs argued the designs were not evidence of available, non-infringing alternatives because the designs did not exist as of the date of the hypothetical negotiation.  The Court overruled Plaintiffs' objection, holding: "The Court finds that availability of a non-infringing alternative during the relevant damages period is a fact question, *see Grain Processing Corp. v. Am. Maize Prods. Co.*, 185 F.3d 1341, 1348, 1353 (Fed. Cir. 1999); *Spectralytics, Inc. v. Cordis Corp.*, 650 F. Supp. 2d 900, 907 (D. Minn. 2009)."  Order on Exhibit Objections (D.I. 78) at 2.  Likewise, the availability of non-infringing alternatives in this case, even if never sold, is a question of fact for the jury to decide.  Accordingly, Plaintiffs' motion should be denied.

## VI.   OPPOSITION TO MOTION *IN LIMINE* NO. 6: APPLIED SHOULD BE PERMITTED TO PRESENT EVIDENCE THAT TROCARS WITH ITS UNIFORMLY THIN LEAFLETS AND ETHICON'S TROCARS ARE NON-INFRINGING ALTERNATIVES

As an initial matter, Applied has never asserted that the dual-thickness leaflet septum shield design (accused in the March 2010 trial) is an available, acceptable, non-infringing alternative to either the Smith or Green patents.  However, Applied does intend to present evidence that Applied's current leaflet septum shield design (what Plaintiffs call "single thickness fingers") is an acceptable non-infringing alternative to the Smith patents.  Applied also intends to show that Ethicon's Xcel seal design is an available and acceptable non-infringing alternative design to all of the patents in suit.

Lost-profit damages are designed to give the patent holder the economic benefits it would have enjoyed absent patent infringement.  *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964).  Reconstruction of the "but for" marketplace "takes account not only of substitutes actually produced but also what would have been produced, had it been economically advantageous to do so."  *Grain Processing Corp. v. American Maize-Products Co.*,

979 F. Supp. 1233, 1236 (N.D. Ind. 1997), *aff'd* 185 F.3d 1341 (Fed. Cir. 1999).  In *Grain Processing Corp.*, the lower court considered the economics of a "but for" world where use of a more expensive alternative technology still precluded lost-profit damages because use of this alternative technology would have forestalled sales diversion to the patentee and "effectively constrain[ed] the patent holder's profits."  *Id.*  The availability of acceptable non-infringing alternatives is also relevant to determining reasonable-royalty damages because only by comparing the patented invention to the next best alternative, can the value of the patents be determined.  *Georgia-Pacific*, 318 F. Supp. at 1120 (factors 9 and 10).  The existence of a noninfringing substitute is a question of fact.  *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed. Cir. 1992).

Plaintiffs' argument that Applied should not be able to rely on its own leaflet septum shield design is without merit.  While Plaintiffs have accused that design of infringing the Green patents, they have not accused that design of infringing the Smith patents.  Therefore, that design is undisputedly a non-infringing alternative to the Smith patents.  Plaintiffs contend, however, without any legal support, that Applied cannot rely on that design in the damages analysis for the Smith patents because it allegedly infringes the Green patents.  Mot. at 15.  Such an approach is unsupported, illogical, and fails to account for significant differences between the Green and Smith patents.

Applied should be able to assert that the leaflet septum shield design is an acceptable non-infringing alternative to the Smith patents to defeat Tyco's claim of nearly $42 million in lost profits.  Tyco is claiming lost profits on only the ***Smith*** patents.[5]  In the "but for" world, if Applied could not have used the pleated skirt shield accused of infringing the Smith patents, it would have been economically advantageous for Applied to incorporate the leaflet septum shield design, thereby negating any diversion of sales to Plaintiffs.  Ex. 7 at ¶¶ 47-52.  If it had done so, at most, Plaintiffs would only have been able to recover a reasonable royalty for infringement of

---

[5] USSC, the owner of the Green patents, concedes it can claim only damages in the form of a reasonable royalty for the Green patents.  Ex. 8 at 9-10, 19.

the Green patents.[6]  Thus, Tyco should not be able to rely on USSC's Green patents to show that this alternative design is unavailable to Applied.  Excluding this non-infringing alternative design from the Smith "but for" world would permit Tyco to obtain lost profit damages on the Green patents through the back door.

Applied should also be able to rely on the leaflet septum shield design for purposes of determining a reasonable royalty for the Smith patents.  Both damages experts in this case have determined a reasonable royalty rate separately for the Smith patents and for the Green patents. In determining a reasonable royalty, the utility and advantages of each patent family must be separately assessed.  *Georgia-Pacific*, 318 F. Supp. at 1120 (factors 9 and 10).  In order to make this determination and evaluate the incremental value of the inventions, each patent family must be compared separately to non-infringing alternatives.

Applied should also be allowed to present evidence that ***the shield design*** used in Ethicon's Xcel trocar is an available, non-infringing alternative.  Plaintiffs erroneously rely on Jeremy Albrecht's deposition testimony as evidence that this shield design is protected by Ethicon's patent and is not available to Applied.  Mot. at 16.  However, Plaintiffs have mischaracterized Mr. Albrecht's testimony.  At most, Mr. Albrecht recognized that some features of Ethicon's Xcel trocar may be protected by Ethicon's patent—but Plaintiffs present no evidence that any portion of the septum shield design is protected by Ethicon's patent and Mr. Albrecht never said it was.  Ex. 5 at 109:5-110:17, 111:2-8.  Moreover, the only evidence of record is that Ethicon pays Applied royalties to use the shield design in its Xcel trocars through the 1998 license agreement.  DX  416, Murray Decl. ¶ 14.

---

[6]  The impropriety of Plaintiffs' argument on the leaflet septum shield design is underscored by the fact that Plaintiffs apparently even seem to be trying to exclude this design if the jury determines that the Green patents are invalid or not infringed.  Ex. 8 at p. 10, scenario 3a.  The parties do not dispute that under this scenario, the leaflet septum shield design would not be infringing ***any*** of Plaintiffs' patents.  Accordingly, even under Plaintiffs' erroneous theory, Applied should not be precluded from relying on the leaflet septum shield design for this scenario.

**VII.  OPPOSITION TO MOTION *IN LIMINE* NO. 7: APPLIED CORRECTLY
ANALYZED THE CLAIMS IN ITS SUMMARY JUDGMENT MOTION ON
COLLATERAL ESTOPPEL**

This motion *in limine* no. 7 and Plaintiffs' motion *in limine* no. 8 to exclude the invalidity
verdict from the March 2010 trial are related.   Both motions concern how the issue of
obviousness of the Green patent claims would be presented to a jury in view of the prior
judgment that Claims 12 and 13 of the Green '143 patent are invalid.  Applied maintains that it is
entitled to summary judgment that the currently asserted Green patent claims are invalid for
collateral estoppel.  That presents an issue of law for the Court.  *Stripling v. Jordan Prod. Co.*,
234 F.3d 863, 868 (5th Cir. 2000).  The present motion *in limine* and Plaintiffs' motion *in limine*
no. 8 to exclude the invalidity verdict would be moot if the Court were to grant Applied's
summary judgment motion.

The complication of needing to decide what legal effect the prior invalidity judgment has
on a jury deciding issues concerning obviousness would arise only if the Court were to decide
that collateral estoppel does not preclude Plaintiffs from contesting the invalidity of the asserted
Green patent claims.  If it did, the Court would then instruct the jury on obviousness, and those
instructions would need to take into consideration the legal effect of the prior invalidity
judgment.

Plaintiffs' motion *in limine* no. 7, to the extent it can be understood, mischaracterizes
Applied's obviousness defense.   Applied does not "boil down the asserted claims to an
individual element" as Plaintiffs allege.  Mot. at 18.  Rather, Applied has presented evidence that
the combination of elements in each asserted claim is obvious over the prior art.  Plaintiffs
identify nothing in the reports of Applied's technical experts that contain allegedly erroneous
opinions on the issue of obviousness.

Instead, Plaintiffs cite *only* to Applied's opening brief on its pending Motion for
Summary Judgment of Patent Invalidity Based on Collateral Estoppel as a purported example of
Applied not considering the claimed invention as a whole for purposes of determining
obviousness.  *See* Mot. at 18, citing D.I. 166.  But Applied's summary judgment motion was

directed to collateral estoppel, which has different elements than obviousness.  Moreover, the summary judgment motion was directed to the Court to decide Applied's collateral estoppel defense.  Courts, not juries, decide collateral estoppel defenses.  *Stripling*, 234 F.3d at 868.

Applied also never argued in its summary judgment motion that limitations such as the "annular ring" or "seating portions" requirements of various asserted claims do not lie "at the heart of the invention" as Plaintiffs allege.  Applied gave proper consideration to all elements of the asserted claims.  For example, with respect to the "annular ring" limitation of asserted Claim 14 of the Green '143 patent, Applied explained that the limitation "does not raise any new issues vis-à-vis the prior art because the same prior art that invalidated Claims 12 and 13 also discloses the straightforward attachment of the valves to an annular ring as recited in Claim 14."  *See* D.I. 166 at 13.  Applied likewise provided a similar explanation for the "seating portions" limitation of Claim 4 of the Green '854 patent.  *Id.* at 18-20.

Furthermore, Plaintiffs are wrong in asserting that all elements of the asserted claims are entitled to equal "import."  None of the cases cited by Plaintiffs stand for that proposition.  Moreover, such an abstract proposition makes no sense when the claims upon which the asserted claim depends have already been held to be invalid for obviousness.  While it is true that the claimed invention must be considered "as a whole" in assessing obvious, it is appropriate to compare the invalidated claims to the newly asserted claims to determine if another trial is even warranted.  *See Bourns, Inc. v. United States*, 537 F.2d 486, 494 (Ct. Cl. 1976).  That is exactly what Applied did in its summary judgment motion.

In *Bourns*, the predecessor court to the Federal Circuit explained the interplay between the indisputable proposition that an obviousness analysis requires that the claimed inventions be viewed "as a whole" and the need to determine if additional limitations to previously invalidated claims warrant another obviousness determination.  The *Bourns* court explained:

> That the subject matter of a claim must be considered as a whole is a position which there is 'no quibble.'  *Graham*, supra, 383 U.S. 32, 86 S. Ct. 684.  But the practicalities are to look to the distinguishing features incorporated into the claims and the validity determination necessarily focuses on those features.  *Id.* at 34, 86 S. Ct. 684.

*Id.*  The *Bourns* court concluded that the added limitations of the newly asserted claims did not warrant a new trial on obviousness because the Plaintiff could not show that those added limitations were of any patentable significance over the invalidated claims.  *Id.*  The same is true here, because all of the evidence shows the added limitations of the newly asserted claims are of no patentable significance over Claims 12 and 13 of the Green '143 patent.

For example, Plaintiffs' motion ignores that it was the means-to-facilitate-expansion limitation that was relied upon to secure allowance of the Green patent claims.  At no time did Plaintiffs rely upon the "seating portions" or "annular ring" limitations singled out in Plaintiffs' motion to distinguish the Green patent claims over the prior art.  Instead, Plaintiffs argued to the Patent Office that the cited prior art did not disclose the claimed means to facilitate expansion. Ex. 9 at 8-11.

Finally, Plaintiffs' motion is so nebulous that it is difficult to ascertain what relief is being sought.  For example, the parties potentially could run afoul of Plaintiffs' motion by simply spending more time at trial presenting evidence or argument on one limitation than another.  But in assessing obviousness, the ***differences*** between the claimed invention and the prior art must be evaluated.  *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966); 35 U.S.C. § 103. Plaintiffs' motion ignores that it is undisputed that there are no differences between many elements of the claimed invention and the prior art.  For example, it is undisputed that the prior art Yoon and Honkanen patents both disclose a housing and valve members.  It is not necessary to give equal "import" during a trial presentation to those claim limitations which Plaintiffs do not even dispute are present in the prior art. Because the motion is so vague in what it seeks to exclude, it should be denied for that reason alone.

## VIII.  OPPOSITION TO MOTION *IN LIMINE* NO. 8: THE ENTIRE JURY VERDICT FROM THE MARCH 2010 TRIAL IS ADMISSIBLE

Plaintiffs want to use at trial the part of the March 2010 jury verdict that they like and prevent the jury from learning about the parts of the verdict that Plaintiffs do not like.  Plaintiffs should not be allowed to black-hat Applied at trial by talking only about the infringement portion

of the prior verdict.  As a matter of fairness, a jury in this phase of the case should learn about the prior verdict in its entirety.  *See* Fed. R. Evid. 106.  The jury in this phase should know that, although a prior jury found that Claim 6 of the Smith '377 patent was infringed, it awarded a reasonably royalty of $1 per unit and found the asserted Green '143 patent claims were invalid.  Otherwise, a jury may incorrectly conclude that Applied lost the prior trial in its entirety.  That would be unfairly prejudicial to Applied.  Moreover, the portions of the prior verdict that Plaintiffs seek to exclude are relevant to issues in this phase of the case and are admissible.

### The Relevance of the Invalidity Judgment

The prior verdict that Claims 12 and 13 of the Green '143 patent are invalid is relevant to multiple issues in this case.  For example, the invalidity verdict is relevant to the issue of damages.  Plaintiffs completely ignore this in their motion.  Indeed, Plaintiffs want to proceed as if the prior invalidity judgment never existed.

The fact that the valve assembly in invalidated Claims 12 and 13 is now in the public domain is relevant to Tyco's claim for lost-profit damages on the Smith patents.  To obtain lost profits, Tyco must show that it would have made Applied's sales "but for" the alleged infringement.  *BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1218 (Fed. Cir. 1993).  Reconstruction of the "but for" market requires taking into account "alternative actions the infringer foreseeably would have undertaken had he not infringed."  *Grain Processing*, 185 F.3d at 1350-51.  The availability of the valve assembly of the previously invalidated claims as an alternative directly bears on this lost-profits determination.

The fact that the valve assembly of Claims 12 and 13 is in the public domain is also relevant to Plaintiffs' reasonably-royalty claim on all of the asserted patents.  Specifically, the fact that the claimed combination of Claims 12 and 13 (which include fingers used in a valve assembly) is an available alternative in the public domain significantly limits the value of additional features specified in the presently asserted dependent claims.  *See*, *e.g.*, *Georgia-Pacific*, 318 F. Supp. at 1120 (Factor Nos. 9, 10 and 15); *see also* Ex. 7 at ¶¶ 68, 102, 122.

Applied also must be able to rely upon the invalidity verdict to refute Plaintiffs' mischaracterization of the reasons why Applied made certain product design changes and Plaintiffs' exaggerated claim as to the importance or value of the Green invention.  Prior to the March 2010 trial, Applied removed the accused leaflet septum shield from some of its Kii trocar products and replaced them with a different shield design that has never been accused of infringing the Smith or Green patents.  After the Green patent claims asserted in the first phase were invalidated, Applied decided to switch back to the leaflet septum shield.  Plaintiffs act as if Applied's decision to switch back to the leaflet septum shield is somehow evidence of the value of the Green patent invention.  In reality, the decision was driven by the fact that Applied did not need to continue evaluating the other shield design because of the invalidity verdict and judgment.  Applied would be unfairly prejudiced if it were unable to use the invalidity judgment at trial to explain the reason for its design changes.

Plaintiffs also incorrectly assert that the prior invalidity verdict is irrelevant to the invalidity of the presently asserted claims.[7]  For all of the reasons set forth in Applied's pending Motion for Summary Judgment of Patent Invalidity Based on Collateral Estoppel (D.I. 166), the prior verdict is unquestionably relevant to the invalidity of the newly asserted Green patent claims.  Plaintiffs also baselessly assert that Applied is relying upon a "domino approach" in which a dependent claim is merely compared to a previously invalidated claim.  Plaintiffs' *sole* support for this accusation is once again Applied's summary judgment motion on collateral estoppel.  Applied's summary judgment motion correctly sets forth the law of collateral estoppel and applies the correct analysis.

Plaintiffs' reliance on *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132 (Fed. Cir. 1985), is misplaced.  The facts of *Interconnect Planning* bear no relationship to the facts of this case.  The plaintiff in *Interconnect Planning* had filed a patent infringement suit.  *Id.* at 1134.  The district court granted summary judgment that all asserted claims of the patent were invalid

---

[7] Additional explanation on this topic is contained in Applied's opposition to motion *in limine* no. 7.

as obvious.  *Id.*  The plaintiff then sought to have the patent reissued by the Patent Office in view of the district court's summary judgment ruling and the prior art upon which the district court relied.  *Id.* at 1134-35.  The plaintiff added claim limitations to overcome the prior art and successfully obtained a reissue patent.  *Id.*  The plaintiff then accused the defendant of infringing the reissue patent.  *Id.* at 1135.  The district court again granted summary judgment, finding that the reissue claims were substantially identical to the invalidated claims and thus invalid based upon collateral estoppel.  *Id.* at 1135 and 1140.  The district court also held that the reissue claims were invalid as obvious.  *Id.*

The Federal Circuit first found that the district court erred in applying collateral estoppel because the reissue claims were not substantially identical to the previously invalidated claims of the original patent.  *Id.* at 1140-41.  The Federal Circuit explained that several limitations were added during the reissue proceedings that made the reissue claims not substantially identical to the original claims.  *Id.* at 1137 ("[w]hen a patent has been reissued with claims that are not substantially identical to the original claims, the invention as a whole, as now claimed, must be evaluated in terms of 35 U.S.C. § 103") and 1141.  There are no such facts here.

The Federal Circuit also found that the district court erred in conducting its obviousness analysis.  The Federal Circuit found that the district court erred by "comparing the differences between the original and the reissue claims with prior art that was pertinent only to those differences, thus effectively giving the original claims prior art effect – the pitfall against which *Bourns* cautioned . . . ."  *Id.* at 1137.  Here, Applied is not treating invalidated Claims 12 and 13 as prior art to the presently asserted claims.  Nor has Applied adopted a "domino approach" in which each successively narrower claim is compared with the claim before it, and not the prior art.  Instead, consistent with the law set forth in *Interconnect Planning*, Applied has shown that the differences between the previously invalidated claims and the presently asserted claims present no new issues relating to the *Graham* factors.  *Id.* at 1136 (quoting at length *Westwood Chemical, Inc. v. United States*, 525 F.2d 1367 (Ct. Cl. 1975) and citing, *inter alia*, *Bourns, Inc. v. United States*, 537 F.2d 486 (Ct. Cl. 1976)).  No new issues arise because the Green patents

attribute no advantage or significance to the features added by the newly asserted claims and such features are indisputably present in the ***same*** prior art references which formed the bases of the judgment that Claims 12 and 13 are invalid.

In sum, the invalidity judgment is relevant to many issues and thus cannot be excluded from trial.

### Relevance of the $1 per Unit Damages Award

The March 2010 verdict of a $1-per-unit reasonable royalty rate for Claim 6 of the Smith '377 patent is admissible in this case because it is relevant to determining a reasonable royalty for the asserted patents.  Specifically, it is relevant to at least the second *Georgia Pacific* factor— the rates paid by the accused infringer to license patents comparable to the patents in suit.  It is also relevant to the fifteenth *Georgia-Pacific* factor, which incorporates all the facts that the parties would have considered in a hypothetical negotiation.  *Georgia-Pacific*, 318 F. Supp at 1120.   Indeed, the verdict addressed the royalty that the accused infringer in this case— Applied—should pay for one of the patents in suit in this case—the Smith '377 patent—in order to make and sell prior versions of the same trocars that are at issue in this case.

Nevertheless, Tyco argues that because the royalty awarded in the 2010 verdict was not based on the exact same patent claim, product, and hypothetical negotiation date as in this case, it is absolutely irrelevant and therefore should be excluded.   As explained below, Tyco's arguments are entirely inconsistent with its position that prior license agreements are highly relevant.   Moreover, Tyco's arguments are really fodder for cross examination going to the weight that should be given that verdict.  They are not a basis for exclusion.

First, contrary to Tyco's implication, Applied does not contend that the prior jury verdict should be determinative of the reasonable royalty rate in this case.  Rather, the verdict is one data point that should be properly considered amongst many other factors used to determine a reasonable royalty.  Even if some of the facts are different between the hypothetical negotiations in the two cases, the parties can explain the effects, if any, that those differences may have on the royalty rate that should apply here.  But the mere fact that there are differences between the

circumstances surrounding the hypothetical negotiation at issue in the March 2010 trial and the hypothetical negotiation now does not mean that the prior verdict is not a useful data point for the situation here.

Second, Tyco's arguments to exclude the prior verdict are entirely inconsistent with its position that prior license agreements are highly relevant.  Specifically, Tyco relies on a 1998 agreement in which Applied licensed Ethicon to practice three of Applied's patents, and a 2005 settlement agreement between Applied and Ethicon.[8]  Unlike the 2010 verdict, the 1998 and 2005 agreements do not involve the present parties, any of the patents in this case, or technology any more analogous than the 2010 case.  Furthermore, each was negotiated well before the hypothetical negotiation date in this case, and the competitive situation between the parties has changed since both of those agreements were executed.  There is no logical basis to contend that those agreements are relevant but the verdict is not.

Tyco argues that, unlike the 1998 and 2005 agreements, Applied and Tyco were not willing participants in the jury verdict.  Therefore, Tyco argues, the earlier agreements are more analogous to the hypothetical negotiation than the prior verdict.  But Tyco ignores that the prior verdict is a determination of the result of a hypothetical negotiation between "willing" participants.  *Georgia-Pacific*, 318 F. Supp. at 1120.  It is also the exact same construct of a hypothetical negotiation applying the *Georgia-Pacific* factors that the jury will be asked to do in this case.

Third, Tyco's position would completely eviscerate the second *Georgia Pacific* factor. That factor addresses rates that the accused infringer paid for patents **comparable** to the patents in suit.  If a different claim of a patent in suit does not qualify as comparable, it is hard to imagine what would qualify.  In addition, nothing in the second factor requires that the comparable license be entered into at the exact same time as the hypothetical negotiation.  Again, such a requirement would be so restrictive that it would render the factor irrelevant.

---

[8] Applied has moved to exclude the 2005 settlement agreement.  *See Applied's* Motion *in Limine* No. 9.

Finally, Tyco also suggests that the prior verdict is unreliable because it is based upon supposedly inaccurate testimony from Said Hilal.  Mot. at 21.  Applied addressed this meritless argument in its opposition to Tyco's motion for a new trial on damages.  In sum, there is no basis for Plaintiffs to parse out parts of the prior verdict they do not like.  The invalidity verdict and the damages award are both highly relevant to numerous issues in this case.

## IX.  OPPOSITION TO MOTION *IN LIMINE* NO. 9: THIS COURT ALREADY CORRECTLY DECIDED THAT *APPLIED I* AND *II* ARE RELEVANT

As Plaintiffs acknowledge, motion *in limine* no. 9 is identical to a prior motion *in limine* Plaintiffs filed before the last trial to exclude any reference to the *Applied I, II* and *III* cases.  *See* D.I. 199 (filed in Civil Action No. 9:06-cv-151) at pp. 4-8.  Applied explained in opposing the motion that the *Applied I* and *Applied II* cases, including the judgments in those cases, are essential to the jury's understanding of the damages issues.  *See* D.I. 211 (filed in Civil Action No. 9:06-cv-151) at pp. 7-10.  The Court denied Plaintiffs' prior motion and held: "The value of the Green and Smith patents, and the amount of damages Tyco can obtain for any infringement of them, is inextricably linked to the previous Tyco/Applied litigation."  D.I. 63 (2/26/2010 Order on Motions in Limine) at p. 4.  Nothing has changed since that denial.  The *Applied I* and *II* cases are still inextricably linked to the value of the Green and Smith patents.[9]

Plaintiffs spend most of their motion arguing that the *Applied I* and *II* injunctions allegedly do not enjoin Plaintiffs from making or selling products covered by the Smith and Green patents.[10]  However, Plaintiffs ignore that they argued the exact opposite in a prior motion *in limine* seeking to exclude evidence concerning Plaintiffs' non-use of the Green and Smith

---

[9] Applied agrees that *Applied III* is not relevant to this case.  In *Applied III*, there was no finding of liability and thus there was no injunction and damages awarded.  Thus, that case does not bear on the issues in this case.

[10] Plaintiffs made a similar argument with respect to the Smith '377 patent in their Motion for Reconsideration of the Court's Order Denying a Permanent Injunction.  D.I. 140. Applied's opposition and sur-reply briefs responding to that motion contain further argument on this issue.  D.I. 149 and 161.

patent invention.  *See* D.I. 199 (filed in Civil Action No. 9:06-cv-151) at pp. 9-10.  In that motion, Plaintiffs argued they could not continue to sell products covered by the Smith and Green patents following the injunction in *Applied I*.  *Id.*  The Court relied upon Plaintiffs' representations in denying their first motion *in limine* seeking to exclude the *Applied I* and *II* cases.  In denying Plaintiffs' prior motion, the Court wrote: "Tyco concedes – in bold italicized font, no less – that Tyco ***could not*** continue to sell its marketed products covered by the '143, '854, '377, and/or '702 patents following the permanent injunction in *Applied I*.'"  *Id.*  The Court then explained that the "value of these four patents to a potential licensee is therefore less than it might normally be . . . ."  *Id.*

In spite of their prior representations to the Court, Plaintiffs persist in arguing that they are actually free to practice the Green and Smith patent inventions despite the *Applied I* or *II* injunctions.  Plaintiffs make the abstract arguments that "only one valid patent can issue on the same invention" and that "Applied's and Plaintiffs' patents claim different things."  Mot. at 24.  However, Plaintiffs fail to acknowledge that patents may have claims that, while different in overall scope, still overlap.  For example, a dominating patent may have claims that are broad enough to encompass the subject matter of a subsequent patent.  *See*, *e.g.*, *In re Kaplan*, 789 F.2d 1574, 1577-78 (Fed. Cir. 1986) ("[O]ne patent dominates another if a claim of the first patent reads on a device built or process practiced according to the second patent disclosure.").  Here, Plaintiffs still have identified no products they have sold, or could possibly sell, that have seal protectors covered by the Green or Smith patents that would not also be covered by the scope of the injunction in *Applied I*.

In sum, the Court was correct in denying Plaintiffs' motion *in limine* on this issue prior to the last trial.  Plaintiffs' motion should be denied yet again on the same grounds.

### X.  OPPOSITION TO MOTION *IN LIMINE* NO. 10: APPLIED SHOULD BE ALLOWED TO PRESENT THE IRISH SEAL AS PRIOR ART OR A CONTEMPORANEOUS INVENTION

Plaintiffs' motion is founded on the erroneous claim that Applied did not assert the Irish Valve as prior art under 35 U.S.C. §102(g).  Mot. at 25 n. 15.  But Applied's invalidity contentions clearly state that "[t]he *prior invention* of the Irish Valve anticipates" the asserted claims of the Smith patents.  Ex. 10 at Appendix C at 2, 12 and Appendix D at 2, 12 (emphasis added).  Section 102(g) governs invalidity due to another person's *prior invention* in this country.  Thus, Applied properly disclosed its contention that the Irish Valve is an invalidating prior invention under 35 U.S.C. §102(g) and §103.  Applied should be permitted to prove its contention at trial.

Plaintiffs assert that the Irish Valve was "promptly abandoned."  Mot. at 25.  But Plaintiffs have not argued that the Court should decide this factual issue on a motion *in limine*. Nor could they.  Whether a prior invention was intentionally abandoned is an intensively factual issue on which both sides bear a burden of proof.  First, Applied must prove prior invention by clear and convincing evidence.  *See Flex-Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351, 1358 (Fed. Cir. 2006).  "If prior invention has been established, the burden shifts to the patentee to produce sufficient evidence to create a genuine issue of material fact as to whether the prior inventor abandoned, suppressed, or concealed the invention."  *Id.*  These factual issues must be addressed at the upcoming trial, not in a one-page motion *in limine*.

Finally, even if Plaintiffs' motion *in limine* were granted, this would only bar Applied from using the Irish Valve as prior art to the Smith patents.  It would not exclude the Irish valve for all purposes.  Most importantly, it would not prevent Applied from relying on the Irish Valve as evidence of contemporaneous development of the inventions described in the asserted *Green* claims.  "Independently made, simultaneous inventions, made within a comparatively short space of time, are persuasive evidence that the claimed apparatus was the product only of ordinary mechanical or engineering skill."  *Geo M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d

1294, 1305 (Fed. Cir. 2010) (citing *Concrete Appliances Co. v. Gomery*, 269 U.S. 177, 184, 46 S. Ct. 42, 70 L. Ed. 222 (1925)) (internal quotes omitted).

At trial, Applied will present the testimony of Corky Hart, the designer of the Irish Valve. Mr. Hart will explain that he developed the Irish Valve with its flexible plastic fingers in early 1991, approximately six months *before* Green filed his patent application.  Mr. Hart will explain that using plastic fingers to protect a soft rubber valve was just common sense in 1991.  Indeed, Mr. Hart will testify that the idea of using fingers occurred to him almost immediately, just weeks after he saw his first trocar.  Thus, the Irish Valve is compelling evidence of the obviousness of the asserted Green claims.

In short, the Court should deny Plaintiffs' motion and permit Applied to rely on the Irish Valve as Section 102(g) prior art to the Smith patents.  Moreover, the Irish valve is relevant to the obviousness of the Green claims as well.

### XI.  OPPOSITION TO MOTION *IN LIMINE* NO. 11: APPLIED SHOULD BE ALLOWED TO PRESENT EVIDENCE AND ARGUMENT RELATED TO PLAINTIFFS' OUTSOURCING OR EXPORTING OF JOBS AND THE FOREIGN STATUS OF COMPANIES AFFILIATED WITH PLAINTIFFS

Applied is a vertically integrated company that designs and manufactures every component of its trocars in-house, in a single location, in Rancho Santa Margarita, California. Ex. 2 at 26-28.  This allows Applied to quickly test and implement any proposed design changes to its trocars to keep pace with the evolving market, at relatively little cost.  Ex. 11 at 125.  This is relevant to Applied's ability to transition to non-infringing alternatives, which in turn is relevant to Plaintiffs' damages claims of both lost profits and reasonable royalty damages.  *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978) (lost profits); *Georgia-Pacific*, 318 F. Supp. at 1120 (factors 9 and 10 related to a reasonable royalty). In addition, Applied spends considerable amounts of money on research and development to continually improve and make more efficient its manufacturing processes, including its manufacturing processes for trocars.  Ex. 11 at 65-66.  These expenditures on research and

development are costs that obviously impact Applied's net profit margins on trocars.  Ex. 12 at 272:13-276:2.

Plaintiffs have made Applied's manufacturing relevant to the case.  Plaintiffs contend that Applied could not quickly or easily implement design changes around the patents in suit, and, therefore, according to Plaintiffs, Applied had no non-infringing alternatives available to it.  Ex. 8 at 21.  Plaintiffs have also consistently relied on Applied's profit margins without taking into account research and development costs and have criticized and mischaracterized Applied's damages expert's allocating research and development costs in determining Applied's net profit margins.  Ex. 12 at 272:13-276:2; Ex. 13 at 228:10-232:5.  It is thus critical for Applied to explain its streamlined manufacturing processes and the relevance of its research and development costs.  In order to provide context, it is also important to contrast Applied's vertically integrated, single location business model with Plaintiffs' multi-national operations that are not vertically integrated and depend on outsourcing.  The contrast is easily understood by reference to Plaintiffs' international corporate status and multi-national base for operations.  Indeed, Plaintiffs concede they employ workers in over 100 countries.  Mot. at 27.

Further, because Plaintiffs are seeking lost profits damages, Plaintiffs have the burden to prove excess manufacturing and marketing capacity to exploit the alleged lost sales.  *Panduit Corp.*, 575 F.2d at 1156.  Evidence of Plaintiffs' multi-national operations that depend on outsourcing for manufacturing is highly relevant to rebut Plaintiffs' claim of excess capacity.  For example, because Plaintiffs outsource manufacturing, they lose a great deal of control over their ability to increase capacity.

Accordingly, Applied's and Plaintiffs' business practices and corporate statuses are relevant to critical issues in this case.  The cases cited by Plaintiffs deal with irrelevant references to foreign corporate status for the mere purpose of currying local favor.  But here, any allegation of jury bias is merely an unintended by-product, outweighed by the probative value of this contextual evidence.  If the Court were to grant Plaintiffs' motion and Applied is precluded from offering evidence on Plaintiffs' foreign corporate status or outsourcing practices, Plaintiffs

too should be precluded from offering evidence that Tyco is a worldwide medical supplies leader or that it has facilities in Texas.  Such evidence would certainly create a false impression that Applied would be in no position to rebut.

## XII.  OPPOSITION TO MOTION *IN LIMINE* NO. 12: APPLIED WILL NOT OFFER ANY TESTIMONY OR EVIDENCE SUGGESTING THAT TYCO HAS INVITED APPLIED TO SELL TROCARS TO EXISTING TYCO ACCOUNTS

Although Applied disputes the merits of Plaintiffs' motion, in an effort to streamline the trial, Applied will agree not to offer testimony or evidence that Tyco has invited Applied to sell trocars to existing Tyco accounts.  This of course presumes that Plaintiffs will not attempt to argue or prove that Tyco has never invited Applied to sell trocars to Tyco accounts.  This also does not preclude Applied from presenting evidence that it has sold trocars to Tyco accounts.

Respectfully submitted,


Dated: April 14, 2011

By: /s/ Sean M. Murray
    Joseph R. Re
    E-mail: jre@kmob.com
    Karen Vogel Weil
    E-mail: kweil@kmob.com
    Joseph F. Jennings
    E-mail: jjennings@kmob.com
    Sean M. Murray
    E-mail: smurray@kmob.com
    Matthew S. Bellinger
    E-mail: mbellinger@kmob.com
    **KNOBBE, MARTENS, OLSON & BEAR, LLP**
    2040 Main Street, 14th Floor
    Irvine, CA 92614
    (949) 760-0404 - Telephone
    (949) 760-9502 – Telecopier
    Attorneys admitted *Pro Hac Vice* for
    APPLIED MEDICAL RESOURCES
    CORPORATION


    J. Mitchell Smith
    State Bar No. 18626900
    E-mail: jmsmith@germer.com
    Lawrence Louis Germer

State Bar No. 07824000
E-mail: llgermer@germer.com
**GERMER GERTZ, L.L.P.**
P.O. Box 4915
Beaumont, Texas 77704-4915
(409) 654-6700 – Telephone
(409) 838-4050 – Telecopier
Attorneys for APPLIED MEDICAL
RESOURCES CORPORATION

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served this 14 April 2011, with a copy of this document via the Court's CM/ECF system.

   /s/  Sean M. Murray        
Sean M. Murray

11028206
040811